## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TOMPKINS BUILDERS, INC.**<br>**1333 H Street, N.W.**<br>**Washington, D.C.  20005**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**ABBA BONDING, INC.**<br>**1334 Ridgewood Drive**<br>**Lillian, AL  36549**<br><br>**and**<br><br>**WGG, INC.**<br>**654 West Main Street**<br>**Palmyra, PA  17078**<br><br>    **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **CIVIL ACTION NO. _____**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### COMPLAINT

Tompkins Builders, Inc. ("Tompkins"), by counsel, for its complaint against ABBA

Bonding, Inc. ("ABBA") and WGG, Inc. ("WGG"), states as follows:

### PARTIES

1.      Tompkins is a corporation organized and existing under the laws of the District of

Columbia, with its principal place of business located in the District of Columbia.

2.      On information and belief, WGG is a corporation organized and existing under

the laws of the State of Pennsylvania, with its principal place of business located in Palmyra,

Pennsylvania.

3.      On information and belief, ABBA is a corporation organized and existing under

the laws of the state of Alabama, with its principal place of business in Lillian, Alabama.

5/5560.1

## JURISDICTION

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest, fees and costs.

5.    Venue is proper in this judicial district under 28 U.S.C. § 1391, in that Tompkins does business in this district and division, and a substantial part of the events giving rise to the claims at issue in this case took place in this judicial district.

## FACTUAL ALLEGATIONS

6.    On or about January 21, 2004, Tompkins entered into a prime contract (the "Prime Contract") with NJA Development Partner LLC ("Owner"), to construct the Capitol Hill Tower apartments, located at 1000 New Jersey Avenue, S.E., Washington, D.C. (the "Project").

7.    On or about November 2, 2004, Tompkins and WGG entered into a written Subcontract (the "Subcontract"), whereby WGG agreed, among other things, to perform and furnish all work, labor, services, materials, plant, equipment, tools, scaffolds, appliances and other things necessary to perform the glass and glazing work for the Project. A true and correct copy of the Subcontract (without attachments) is attached hereto as Exhibit A.

8.    On or about December 28, 2004, ABBA, as surety, issued a Labor and Material Payment Bond, No. RL7866, on behalf of WGG, as principal, and in favor of Tompkins, as obligee (the "Payment Bond"). In the Payment Bond, ABBA guaranteed to make payment to all persons supplying labor and material used or reasonably required for use in the performance of WGG's Subcontract. The Subcontract is expressly incorporated into the Payment Bond by reference. WGG is jointly and severally liable with ABBA under the Payment Bond. Morris C. Sears ("Sears") executed the Payment Bond as attorney-in-fact on behalf of ABBA. A true and correct copy of the Payment Bond is attached hereto as Exhibit B.

9.      On or about December 28, 2004, ABBA, as surety, issued a Performance Bond, No. RL7866, on behalf of WGG, as principal, and in favor of Tompkins, as obligee (the "Performance Bond"). In the Performance Bond, ABBA guaranteed the performance of its principal, WGG, under the Subcontract, and agreed to promptly remedy any default by WGG or promptly complete, or provide sufficient funds to complete, the Subcontract in accordance with its terms and conditions should WGG fail to do so. The Subcontract is expressly incorporated into the Performance Bond by reference. WGG is jointly and severally liable with ABBA under the Performance Bond. Sears executed the Performance Bond as attorney-in-fact on behalf of ABBA. A true and correct copy of the Performance Bond is attached hereto as Exhibit C.

10.     In the Subcontract, ABBA and WGG each agreed to indemnify, hold harmless and defend Tompkins from, among other things, any cost, expense, liability or damage, including legal fees, arising out of WGG's failure to perform its obligations under the Subcontract. Article XI of the Subcontract General Conditions provides, in relevant part, as follows:

> Subcontractor, in addition to any other rights available to Contractor hereunder, agrees to indemnify, hold harmless and defend Contractor from and against any and all claims, demands, suits, damages, judgments, liabilities, costs and expenses (including legal fees and disbursements) arising out of or related to (a) Subcontractor's breach of any term of the Agreement.

(Exhibit A, Subcontract, Article XI).

11.     The Subcontract further provides, in relevant part, as follows:

> Should the progress of the Work or of the Project be delayed, disrupted, hindered, obstructed, or interfered with by any fault or neglect or act or failure to act of the Subcontractor or any of its officers, agents, servants, employees, subcontractors or suppliers so as to cause any additional cost, expense, liability or damage to Contractor including legal fees and disbursements incurred by Contractor (whether incurred in defending claims arising from such delay or in seeking reimbursement and indemnity from the Subcontractor and its surety hereunder or otherwise) or to the Owner or any damages or additional costs or expenses for which Contractor or the owner may or shall become liable, the Subcontractor and its surety shall and does hereby agree to compensate Contractor and the

Owner for and indemnify them against all such costs, expenses, damages and liability.

(Exhibit A, Subcontract, Article III).

12.     WGG failed to properly or timely fulfill its obligations under the Subcontract. Among other breaches and defaults, WGG failed to prosecute its work with promptness and diligence, failed to complete its work in accordance with the construction schedule, failed to provide sufficient skilled manpower to complete its work, failed to supply sufficient material and equipment to complete its work, failed to pay for labor, materials, equipment, supplies and services used in the performance of its work, and failed to perform its work in accordance with the Contract Documents.  Throughout 2005 and 2006, Tompkins met and corresponded with WGG on numerous occasions regarding these breaches and defaults, and Tompkins routinely copied ABBA and Sears on the correspondence.

13.     WGG failed to remedy these breaches and defaults.  As a result, on several occasions, including, without limitation, April 12, 2006, and September 29, 2006, Tompkins notified WGG, ABBA and Sears, in writing, that WGG was in default under the Subcontract.

14.     On or about April 18, 2006, Sears and ABBA acknowledged, in writing, Tompkins' April 12, 2006, notice of default to WGG, and represented that ABBA would provide all labor and materials necessary to complete the Subcontract.  Throughout 2006, ABBA and Sears corresponded and communicated with Tompkins, repeatedly representing to Tompkins that ABBA would fulfill its obligations under the Payment Bond and the Performance Bond, and complete the Subcontract work.  Some of these representations were made by Sears and other representatives of ABBA in person at the Project site in Washington, D.C.

15.     Notwithstanding these promises and representations, to date ABBA has failed and refused to provide the labor and materials necessary to complete the Subcontract.

16.    In addition, WGG has not made payment to numerous suppliers for labor, materials, equipment, supplies, services and the like, used or reasonably required for use in the performance of the Subcontract, in the amount of at least $125,000.00, and one or more of such suppliers have given notice of their claims to Tompkins. Tompkins notified ABBA and WGG of these supplier claims. To date, neither ABBA nor WGG has made payment to such suppliers.

17.    On or about September 29, 2006, Tompkins made claim against ABBA under the Performance Bond for the costs, expenses and damages arising out of WGG's defaults under the Subcontract (the "Performance Bond Claim"). A true and correct copy of Tompkins' Performance Bond Claim is attached hereto as Exhibit D.

18.    ABBA wrongfully failed and/or refused to respond to the Performance Bond Claim, and failed and/or refused to perform its obligations under the Performance Bond.

19.    ABBA wrongfully failed and/or refused to perform its obligations under the Payment Bond.

20.    At the time it issued the Payment Bond and the Performance Bond, and at all times thereafter, ABBA had not qualified to conduct insurance transactions in the District of Columbia, and, on information and belief, none of its officers, agents, or employees, including Sears, had obtained licenses to engage in the insurance business in the District of Columbia.

21.    On or about March 11, 2005, the State of Alabama Department of Insurance ordered that ABBA and Sears immediately cease and desist from engaging in insurance transactions ("Cease and Desist Order"). Neither ABBA nor Sears disclosed the Cease and Desist Order to Tompkins.

22.    As a result of WGG's and ABBA's defaults and breaches, Tompkins was caused and continues to be caused to perform work that should have been performed by WGG or ABBA, repair or replace work improperly performed by WGG, and otherwise incur costs and

expenses, including legal fees, all of which have caused damages to Tompkins in excess of $75,000, exclusive of interest, fees and costs.

23.    Tompkins performed all the terms and conditions required of it under the Subcontract, the Payment Bond and the Performance Bond and/or is otherwise excused from performance because of WGG's breaches of its obligations to Tompkins and/or ABBA's breaches of its obligations to Tompkins.

24.    Tompkins has retained the services of the undersigned attorneys to enforce its rights under the Payment Bond, the Performance Bond, and the Subcontract, and has agreed to pay them a reasonable fee therefore.

## Count I
### Breach of Payment Bond Against ABBA

25.    The allegations of Paragraphs 1 through 24 are hereby incorporated by reference.

26.    ABBA and WGG issued a Payment Bond whereby ABBA and WGG each agreed, among other things, to make payment to all persons supplying labor and materials used or reasonably required for use in the performance of WGG's Subcontract, up to at least $1,741,657.00, should WGG fail to make such payments.  WGG and ABBA are jointly and severally liable under the Payment Bond.

27.    ABBA was informed timely of WGG's failure to pay for labor, materials, equipment, supplies, services and the like, used or reasonably required for use in the performance of WGG's Subcontract, and ABBA failed or refused to cure the default.

28.    ABBA failed and refused to perform its obligations under the Payment Bond.

29.    ABBA's failure to perform its obligations under the Payment Bond constitutes a breach of contract.

30.    ABBA's failure and refusal to perform its obligations under the Payment Bond constitutes a breach of its duty of good faith and fair dealing.

31.    Tompkins performed all the terms and conditions required of it under the Subcontract and the Payment Bond and/or is otherwise excused from performance because of WGG's breach of its obligations to Tompkins and/or ABBA's breach of its obligations to Tompkins.

32.    As a result of ABBA's breaches, Tompkins has suffered, and will suffer, substantial damages in excess of $75,000.00, exclusive of interest, fees and costs.

33.    Tompkins is entitled to an award of interest, costs and attorneys' fees against ABBA.

**WHEREFORE,** Tompkins demands judgment in favor of Tompkins and against ABBA, in excess of $75,000.00, exclusive of interest, fees and costs, for all damages, costs and expenses, including attorneys' fees, incurred by Tompkins as a result of WGG's failure to make payment for labor and materials used or reasonably required for use in the performance of WGG's Subcontract and for ABBA's breaches, and for such further and different relief as the Court deems just and proper.

### Count II
### Breach of Performance Bond Against ABBA

34.    The allegations of Paragraphs 1 through 33 are hereby incorporated by reference.

35.    ABBA and WGG issued a Performance Bond whereby ABBA and WGG each agreed, among other things, to promptly remedy any default by WGG, or to promptly complete, or provide sufficient funds to complete, the Subcontract in accordance with its terms and conditions should WGG fail to do so.  WGG and ABBA are jointly and severally liable under the Payment Bond.

36.    ABBA was informed timely of WGG's defaults under the Subcontract and failed or refused to cure the defaults.

37.    ABBA failed and refused to perform its obligations under the Performance Bond.

38.     ABBA's failure to perform its obligations under the Performance Bond constitutes a breach of contract.

39.     ABBA's failure and refusal to perform its obligations under the Performance Bond constitutes a breach of its duty of good faith and fair dealing.

40.     Tompkins performed all the terms and conditions required of it under the Subcontract and the Performance Bond and/or is otherwise excused from performance because of WGG's breach of its obligations to Tompkins and/or ABBA's breach of its obligations to Tompkins.

41.     As a result of ABBA's breach, Tompkins has suffered, and will suffer, substantial damages in excess of $75,000.00, exclusive of interest, fees and costs.

42.     Tompkins is entitled to an award of interest, costs and attorneys' fees against ABBA.

**WHEREFORE,** Tompkins demands judgment in favor of Tompkins and against ABBA, in excess of $75,000.00, exclusive of interest, fees and costs, for all damages, costs and expenses, including attorneys' fees incurred by Tompkins as a result of WGG's and ABBA's defaults and breaches, and for such further and different relief as the Court deems just and proper.

### Count III
### Breach of Contract Against WGG

43.     The allegations of Paragraphs 1 through 42 are hereby incorporated by reference.

44.     On or about November 2, 2004, Tompkins and WGG entered into a written Subcontract, whereby WGG agreed, among other things, to perform and furnish all work, labor, services, materials, plant, equipment, tools, scaffolds, appliances and other things necessary to perform the glass and glazing work for the Project.

45.    WGG failed to provide all labor, materials, and equipment necessary for the completion of the work described in the Subcontract, in strict accordance and full compliance with the terms of the Subcontract.

46.    WGG failed to ensure that all lower-tier subcontractors and suppliers, at all times, were timely paid all amounts due for labor and materials in connection with the performance of the Subcontract.

47.    WGG failed to defend, indemnify and hold Tompkins harmless from all claims, demands, damages, liabilities, costs and expenses, including attorneys' fees, arising out of WGG's failures to perform its obligations under the Subcontract.

48.    WGG's defaults and failures to perform constitute material breaches of the Subcontract.

49.    As a result of WGG's defaults, Tompkins has suffered, and will suffer, substantial damages in excess of $75,000.00, exclusive of interest, fees and costs.

50.    Tompkins performed all the terms and conditions required of it under the Subcontract and/or is otherwise excused from performance because of WGG's breaches of its obligations to Tompkins.

51.    Tompkins is entitled to an award of interest, costs and attorneys' fees against WGG.

**WHEREFORE,** Tompkins demands judgment in favor of Tompkins and against WGG, in excess of $75,000.00, exclusive of interest, fees and costs, for the amount of Tompkins' actual damages, as proven at trial, together with costs, attorneys' fees, and interest, and such further and different relief as the Court deems just and proper.

Respectfully submitted,

_____
DOUGLAS L. PATIN (D.C. BAR NO. 295139)
ROBERT J. SYMON (D.C. BAR NO. 436245)
BRADLEY ARANT ROSE & WHITE LLP
1133 Connecticut Avenue, NW, 12th Floor
Washington, D.C. 20036
Telephone:     202-393-7150
Facsimile:     202-347-1694
*ATTORNEYS FOR TOMPKINS BUILDERS, INC.*

5/5560.1

FORM 36 REV 2/12/01

**This Agreem**    made as of the **2nd day of November, 2004** by    between Tompkins Builders, Inc., a District of Columbia Corporation, (t    ..nafter called Contractor) and

**WGG, Inc.**                    (a Pennsylvania Corporation)
**654 West Main Street**
**Palmyra, PA  17078**
**Phone:  717-838-9775**
**Fax:  717-838-7990**
**Contact:  Robert Carlson**                    (hereinafter called the Subcontractor).

**Witnesseth,** that the Subcontractor and Contractor agree as follows:

**Description of Work**

Article I.  The Subcontractor shall perform and furnish all the work, labor, services, materials, plant, equipment, tools, scaffolds, appliances and other things necessary for **Glass & Glazing as further defined in the Additional provisions and Scope of Work attached herein** (hereinafter called the Work) for and at the **Capitol Hill Tower**  (hereinafter called the Project), located on premises at 1000 New Jersey Avenue, SE, Washington, DC 20003 (hereinafter called the Premises), as shown and described in and in strict accordance with the Plans, Specifications, General Conditions, Special Conditions and Addenda thereto prepared by **SK&I Architects & Planners**  (hereinafter called the Architect) and with the terms and provisions of the General Contract (hereinafter called the General Contract) between Contractor and **NJA Development Partner LLC** (hereinafter called the Owner) dated 1/21/04  and in strict accordance with the Additional Provisions AP-1 to AP-6 annexed hereto and made a part hereof.

**Contract Documents**

Article II.  The Plans, Specifications, General Conditions, Special Conditions, Addenda and General Contract hereinabove mentioned, are available for examination by the Subcontractor at all reasonable times at the office of Contractor; all of the aforesaid, including this Agreement, being hereinafter sometimes referred to as the Contract Documents.  The Subcontractor represents and agrees that it has carefully examined and understands this Agreement and the other Contract Documents, has investigated the nature, locality and site of the Work and the conditions and difficulties under which it is to be performed and that it enters into this Agreement on the basis of its own examination, investigation and evaluation of all such matters and not in reliance upon any opinions or representations of Contractor, or of the Owner, or of any of their respective officers, agents, servants, or employees.

With respect to the Work to be performed and furnished by the Subcontractor hereunder, the Subcontractor agrees to be bound to Contractor by each and all of the terms and provisions of the General Contract and the other Contract Documents, and to assume toward Contractor all of the duties, obligations and responsibilities that Contractor by those Contract Documents assumes toward the Owner, and the Subcontractor agrees further that Contractor shall have the same rights and remedies as against the Subcontractor as the Owner under the terms and provisions of the General Contract and the other Contract Documents has against Contractor with the same force and effect as though every such duty, obligation, responsibility, right or remedy were set forth herein in full.  The terms and provisions of this Agreement with respect to the Work to be performed and furnished by the Subcontractor hereunder are intended to be and shall be in addition to and not in substitution for any of the terms and provisions of the General Contract and the other Contract Documents.

This Subcontract Agreement, the provisions of the General Contract and the other Contract Documents are intended to supplement and complement each other and shall, where possible, be thus interpreted.  If, however, any provision of this Subcontract Agreement irreconcilably conflicts with a provision of the General Contract and the other Contract Documents, the provision imposing the greater duty or obligation on the Subcontractor shall govern.

The parties recognize that problems and disputes between them may occur and that it is preferable for them to reach an amicable resolution of same without the need to resort to formal dispute resolution procedures.  In that regard, they each pledge to participate in good faith in voluntary and non-binding Alternate Dispute Resolution (ADR) procedures.  However, in the event that such disputes are not resolved by mediation or another ADR procedure as Contractor and the Subcontractor may agree then such disputes shall be resolved at Contractor's sole option either in the manner and forum pursuant to which disputes between the Owner and Contractor are to be resolved under the terms of the General Contract or according to law.  Furthermore, the Subcontractor agrees that Contractor shall have the exclusive right to join the Subcontractor as a party in any dispute resolution procedure (including without limitation ADR procedures, binding arbitration or other judicial or non-judicial proceeding) between the Owner and Contractor, together with such other subcontractors or parties as may be appropriate, where in the judgment of Contractor the issues in dispute are related to the work or performance of the Subcontractor.  Furthermore, the subcontractor expressly agrees to waive its right to trial by jury in case Contractor elects to resolve the dispute in litigation.

**Time of Completion**

Article III.  The Subcontractor shall commence the Work when notified to do so by Contractor and shall diligently and continuously prosecute and complete the Work and coordinate the Work with the other work being performed on the Project, in accordance with those project schedules as may be issued from time to time during the performance of the Work, and any other scheduling requirements listed in this Agreement, so as not to delay, impede, obstruct, hinder or interfere with the commencement, progress or completion of the whole or any part of the Work or other work on the Project.

The Subcontractor shall participate and cooperate in the development of schedules and other efforts to achieve timely completion of the Work providing information for the scheduling of the times and sequence of operations required for its Work to meet Contractor's overall schedule requirements, shall continuously monitor the project schedule so as to be fully familiar with the timing, phasing and sequence of operations of the Work and of other work on the Project, and shall execute the Work in accordance with the requirements of the project schedule including any revisions thereto.

Should the progress of the Work or of the Project be delayed, disrupted, hindered, obstructed, or interfered with by any fault or neglect or act or failure to act of the Subcontractor or any of its officers, agents, servants, employees, subcontractors or suppliers so as to cause any additional cost, expense, liability or damage to Contractor including legal fees and disbursements incurred by Contractor (whether incurred in defending claims arising from such delay or in seeking reimbursement and indemnity from the Subcontractor and its surety hereunder or otherwise) or to the Owner or any damages or additional costs or expenses for

1

Project 9989B0
Account Codes: CCCS Code: 0880 / Phase Code: 08800(34)
Contract 017 – WGG, Inc.



**EXHIBIT A**

Initials:



FORM 36 REV 2/12/01

which Contractor or the ___ __er may or shall become liable, the Subcontractor ar___ surety shall and does hereby agree to compensate Contractor ___ the Owner and indemnify them against all such c___ __s, expenses, damages and liability.

Contractor, if it deems necessary, may direct the Subcontractor to work overtime and, if so directed, the Subcontractor shall work said overtime and, provided that the Subcontractor is not in default under any of the terms or provisions of this Agreement or of any of the other Contract Documents, Contractor will pay the Subcontractor for such actual additional wages paid, if any, at rates which have been approved by Contractor plus taxes imposed by law on such additional wages, plus workers' compensation insurance, liability insurance and levies on such additional wages if required to be paid by the Subcontractor to comply with Subcontractor's obligations under this Agreement.

If, however, the progress of the Work or of the Project be delayed by any fault or neglect or act or failure to act of the Subcontractor or any of its officers, agents, servants, employees, subcontractors or suppliers, then the Subcontractor shall, in addition to all of the other obligations imposed by this Agreement upon the Subcontractor in such case, and at its own cost and expense, work such overtime as may be necessary to make up for all time lost in the completion of the Work and of the Project due to such delay. Should the Subcontractor fail to make up for the time lost by reason of such delay, Contractor shall have the right to cause other Subcontractors to work overtime and to take whatever other action it deems necessary to avoid delay in the completion of the Work and of the Project, and the cost and expense of such overtime and/or such other action shall be borne by the Subcontractor.

**Price**

Article IV. The sum to be paid by Contractor, out of funds received from the owner, to the Subcontractor for the satisfactory performance and completion of the Work and of all of the duties, obligations and responsibilities of the Subcontractor under this Agreement and the other Contract Documents shall be **One million seven hundred six thousand six hundred fifty seven and 00/100, ($1,741,657.00 )** (hereinafter called the Price) subject to additions and deductions as herein provided.

The Price includes all Federal, State, County, Municipal and other taxes imposed by law and based upon labor, services, materials, equipment or other items acquired, performed, furnished or used for and in connection with the Work, including but not limited to sales, use and personal property taxes payable by or levied or assessed against the Owner, Contractor or the Subcontractor. Where the law requires any such taxes to be stated and charged separately, the total price of all items included in the Work plus the amount of such taxes shall not exceed the Price.

**Monthly Estimate**

On or before the last day of each month the Subcontractor shall submit to Contractor, in the form required by Contractor, a written requisition for payment showing the proportionate value of the Work installed to that date, from which shall be deducted: a reserve of ten per cent (10%); all previous payments; all amounts and claims against Subcontractor, by Contractor or any third party, for which Subcontractor is responsible hereunder; and all charges for services, materials, equipment and other items furnished by Contractor to or chargeable to the Subcontractor; and the balance of the amount of such requisition, as approved by Contractor and the Architect and for which payment has been received by Contractor from the Owner, shall be due and paid to the Subcontractor on or about the fifteenth (15th) day of the succeeding month or in accordance with the Contract Documents.

The obligation of Contractor to make a payment under this Agreement, whether a progress or final payment, or for extras or change orders or delays to the Work, is subject to the express condition precedent of payment therefor by the Owner. If Contractor has provided payment or performance bonds or a combination payment and performance bond, the obligation of Contractor and its surety under any of those bonds to make any payment (whether a progress payment or final payment) to a claimant on that bond is similarly subject to the express condition precedent of payment therefor by the Owner.

The Subcontractor shall submit with its first requisition for payment a detailed schedule showing the breakdown of the Price into its various parts for use only as a basis of checking the Subcontractor's monthly requisitions.

Contractor reserves the right to advance the date of any payment (including the final payment) under this Agreement if, in its sole judgment, it becomes desirable to do so.

The Subcontractor agrees that, if and when requested to do so by Contractor, it shall furnish such information, evidence and substantiation as Contractor may require with respect to the nature and extent of all obligations incurred by the Subcontractor for or in connection with the Work, all payments made by the Subcontractor thereon, and the amounts remaining unpaid, to whom and the reasons therefor.

**Final Payment**

Final payment to the Subcontractor shall be made only with funds received by Contractor from the Owner, the Construction Lender or the Owner's Agent as final payment for Work under the General Contract. Final payment to Contractor by the Owner shall be an express condition precedent which must occur before Contractor shall be obligated to make final payment to the Subcontractor. In addition, final payment by Contractor to the Subcontractor shall not become due and payable until the following other express conditions precedent have been met: (1) the completion and acceptance of the Work by Contractor and the Architect; (2) provision by the Subcontractor of evidence satisfactory to Contractor that there are no claims, obligations or liens outstanding or unsatisfied for labor, services, materials, equipment, taxes or other items performed, furnished, or incurred for or in connection with the Work; (3) execution and delivery by the Subcontractor, in a form satisfactory to Contractor of a general release running to and in favor of Contractor and the Owner; and (4) complete and full satisfaction of all claims, demands and disputes, and all obligations and responsibilities of Subcontractor, arising out of or related to the Subcontract, including those as between Contractor and Subcontractor as well as those between Subcontractor and any third party. Should there] be any such claim, obligation or lien or unsatisfied obligation or responsibility whether before or after final payment is made, the Subcontractor shall pay, refund or deliver to Contractor (1) all monies that Contractor and/or the Owner shall pay in satisfying, discharging or defending against any such claim, obligation or lien or any action brought or judgment recovered thereon and all costs and expenses, including legal fees and disbursements, incurred in connection therewith; and (2) such amounts as Contractor or Owner shall, in their sole discretion, determine to be an amount sufficient to protect Contractor and Owner therefrom (in lieu of payment of such amounts, Subcontractor may, at Owner's and Contractor's sole discretion, deliver a bond satisfactory to Contractor and Owner). Such refund and payment shall be made within ten (10) days of request by Contractor to Subcontractor for same. The final payment shall be due within forty (40) days after all of these express conditions precedent have been met.

2

Initials: _____

FORM 36 REV 2/12/01

**Payments Withheld**

If any claim or li[en] made or filed with or against Contractor, the Owne[r], Project, the Premises or the Project funds by any person claiming that t... Subcontractor or any subcontractor or other person ...er subcontract to Subcontractor, or any person or entity employed or engaged by or through Subcontractor at any tier, has failed to make payment for any labor, services, materials, equipment, taxes or other items or obligations furnished or incurred for or in connection with the Work, or if any such claim or lien is filed or presented, or if Contractor, in good faith, believes that such a claim or lien may be filed or brought, or if at any time there shall be evidence of such nonpayment or of any claim or lien for which, if established, Contractor or the Owner might become liable and which is chargeable to the Subcontractor, or if the Subcontractor or any subcontractor or other person under subcontract to Subcontractor, or any person or entity employed or engaged by or through Subcontractor at any tier. causes damage to the Work or to any other work on the Project, or if the Subcontractor fails to perform or is otherwise in default under any of the terms or provisions of this Agreement, Contractor shall have the right (A) to retain from any payment then due or thereafter to become due an amount which it deems sufficient to (1) satisfy, discharge and/or defend against any such claim or lien or any action which may be brought or judgment which may be recovered thereon, (2) make good any such nonpayment, damage, failure or default, and (3) compensate Contractor and the Owner for and indemnify and hold them harmless against any and all losses, liability, damages, costs and expenses, including legal fees and disbursements, which may be sustained or incurred by either or both of them in connection therewith ; and (B) to demand that Subcontractor provide, within ten (10) days of Contractor's request therefor, proof to the satisfaction of Contractor and Owner that such non-payment, claim or lien has been fully satisfied, dismissed and discharged.  Upon the failure of Subcontractor to fulfill the requirements of a demand issued by Contractor pursuant to subsection (B) above, Contractor may, in such manner as Contractor may in its sole discretion determine, secure the satisfaction, dismissal and discharge of such claim, by payment or otherwise, and Subcontractor shall within ten (10) days of demand therefor, be liable for and pay to Contractor all amounts (including legal fees and disbursements) incurred or suffered by Contractor or Owner arising out of or related thereto.  Contractor shall, in addition, have the right to apply and charge against the Subcontractor so much of the amount retained as may be required for the foregoing purposes.  Subcontractor further agrees to indemnify, hold harmless and defend Contractor and Owner, upon demand, for any and all such claims, liens, and the costs, expenses (including legal fees and disbursements), damages and liabilities arising out of or related thereto.  Subcontractor acknowledges (1) that discharge of such liens or claims by bond imposes liability upon a surety and Contractor, and (2) that Contractor is not required to discharge such lien or claims by bond when exercising its rights hereunder.

**Payments etc.,
non Acceptance**

No payment (final or otherwise) made under or in connection with this Agreement shall be conclusive evidence of the performance of the Work or of this Agreement, in whole or in part, and no such payment shall be construed to be an acceptance of defective, faulty or improper work or materials nor shall it release the Subcontractor from any of its obligations under this Agreement; nor shall entrance and use by the Owner constitute acceptance of the Work or any part thereof.  The failure of Subcontractor to fully perform and satisfy any or all obligations set forth in this Article IV shall constitute a default, entitling Contractor to take action as described in Art. XI.

**Extension of Time**

Article V.   Should the Subcontractor be delayed, obstructed, hindered or interfered with in the commencement, prosecution or completion of the Work by any cause including but not limited to any act, omission, neglect, negligence or default of Contractor or of anyone employed by Contractor or by any other contractor or subcontractor on the Project, or by the Architect, the Owner or their contractors, subcontractors, agents or consultants, or by damage caused by fire or other casualty or by the combined action of workers or by governmental directive or order in no wise chargeable to the Subcontractor, or by any extraordinary conditions arising out of war or government regulations, or by any other cause beyond the control of and not due to any fault, neglect, act or omission of the Subcontractor, its officers, agents, employees, subcontractors or suppliers, then except where the General Contract has specific requirements at variance with the foregoing, in which case the requirements of the General Contract shall govern the Subcontractor shall be entitled to an extension of time for a period equivalent to the time lost by reason of any and all of the aforesaid causes; provided, however, that the Subcontractor shall not be entitled to any such extension of time unless the Subcontractor (1) notifies Contractor in writing of the cause or causes of such delay, obstruction, hindrance or interference within forty eight (48) hours of the commencement thereof and (2) demonstrates that it could not have anticipated or avoided such delay, obstruction, hindrance or interference and has used all available means to minimize the consequences thereof.  Subcontractor acknowledges that provision of such notice is an essential condition precedent to Subcontractor's rights in connection with any such delays, obstructive hindrances or interferences to Contractor's ability to fully identify, and expeditiously, address and avoid such cause or causes, and, accordingly, Subcontractor expressly waives all rights with respect to any such cause or causes for which notice hereunder was not provided.    Notwithstanding the foregoing, if the General Contract is at variance with granting such time extension, then the provisions of the General Contract shall control.

The Subcontractor agrees that it shall not be entitled to nor claim any cost reimbursement, compensation or damages for any delay, obstruction, hindrance or interference to the Work except to the extent that Contractor has actually recovered corresponding cost reimbursement, compensation or damages from the Owner under the Contract Documents for such delay, obstruction, hindrance or interference, and then only to the extent of the amount, if any, which Contractor on behalf of the Subcontractor, actually received from the Owner on account of such delay, obstruction, hindrance or interference. Notwithstanding any term or provision herein to the contrary, Subcontractor expressly waives and releases all claims or rights to recover lost profit (except for profit on work actually performed), recovery of overhead (including home office overhead), and any other indirect damages, costs or expenses in any way arising out of or related to the Agreement, including the breach thereof by Contractor, delays, charges, acceleration, loss of efficiency or productivity disruptions and interferences with the performance of the work.

It shall be an express condition precedent to any obligation on the part of Contractor to make payment of any such cost, reimbursement, compensation or damages to the Subcontractor hereunder that Contractor shall first be determined to be entitled to such compensation on behalf of the Subcontractor and then receive such payment from Owner, and Subcontractor expressly acknowledges that Contractor is not obligated or required to pursue Subcontractor claims as against Owner if Contractor, in its sole discretion, after review of Subcontractor's claim, has deemed the claim to lack merit in whole or in part.

The Subcontractor agrees that it shall contribute a fair and proportionate share of the costs of advancing the claims of the Subcontractor for delay, including but not limited to legal and other professional fees.

**Freight Charges
and Shipments**

Article VI.  The Subcontractor in making or ordering shipments shall not consign or have consigned materials, equipment or any other items in the name of Contractor.  Contractor is under no obligation to make payment for charges on shipments made by or to the Subcontractor but may, at its option, pay such charges, in which case the Subcontractor shall reimburse Contractor for

3

Initials:

FORM 36 REV 2/12/01

the amount of such payr          plus a service charge of twenty-five percent (25%)          e amount so paid.

**Dimensions**

Article VII.  Notwithstanding the dimensions on the Plans, Specifications and other Contract Documents it shall be the obligation and responsibility of the Subcontractor to take such measurements as will insure the proper matching and fitting of the Work covered by this Agreement with contiguous work.

**Shop Drawings**

The Subcontractor shall prepare and submit to Contractor such shop drawings as may be necessary to describe completely the details and construction of the Work.  Approval of such shop drawings by Contractor and/or the Architect shall not relieve the Subcontractor of its obligation to perform the Work in strict accordance with the Plans, Specifications, the Additional Provisions hereof and the other Contract Documents, nor of its responsibility for the proper matching and fitting of the Work with contiguous work and the coordination of the Work with other work being performed on the site, which obligation and responsibility shall continue until completion of the Work.

The Subcontractor's submission of a shop drawing to Contractor shall constitute the Subcontractor's representation, upon which Contractor may rely, that the Subcontractor has reviewed the submission for accuracy and compliance with all Contract Documents and that wherever engineering is required to be performed, same has been performed by a qualified and licensed engineer.  Furthermore, the review of the Shop Drawing by Contractor shall not constitute an undertaking by Contractor to identify deficiencies in the submission, that being an undertaking within the sole responsibility of the Subcontractor.

**Contiguous Work**

Should the proper and accurate performance of the Work hereunder depend upon the proper and accurate performance of other work not covered by this Agreement, the Subcontractor shall carefully examine such other work, determine whether it is in fit, ready and suitable condition for the proper and accurate performance of the Work hereunder, use all means necessary to discover any defects in such other work, and before proceeding with the Work hereunder, report promptly any such improper conditions and defects to Contractor in writing and allow Contractor a reasonable time to have such improper conditions and defects remedied.

**Interpretation of Plans and Specifications**

Article VIII.  The Work hereunder is to be performed and furnished under the direction and to the satisfaction of both the Architect and Contractor.  The decision of the Architect as to the true construction, meaning and intent of the Plans and Specifications shall be final and binding upon the parties hereto.  Contractor will furnish to the Subcontractor such additional information and Plans as may be prepared by the Architect to further describe the Work to be performed and furnished by the Subcontractor and the Subcontractor shall conform to and abide by the same.

The Subcontractor shall not make any changes, additions and/or omissions in the Work except upon written order of Contractor as provided in Article IX hereof.

**Change Orders, Additions and Deductions**

Article IX.  Contractor reserves the right, from time to time, whether the Work or any part thereof shall or shall not have been completed, to make changes, additions and/or omissions in the Work as it may deem necessary, upon written order to the Subcontractor.  The value of the work to be changed, added or omitted shall be stated in said written order and shall be added to or deducted from the Price.

The value of the work to be changed, added or omitted shall be determined by the lump sum or unit prices, if any, stipulated herein for such work.  If no such prices are stipulated, such value shall be determined by whichever of the following methods or combination thereof Contractor may elect:
    A) By adding or deducting a lump sum or an amount determined by a unit price agreed upon between the
    parties hereto.
    B) By adding (1) the actual net cost to the Subcontractor of labor in accordance with the established rates,
    including required union benefits, premiums the Subcontractor is required to pay for workmen's
    compensation and liability insurance, and payroll taxes on such labor, (2) the actual cost to the
    Subcontractor of materials and equipment and such other direct costs as may be approved by Contractor
    less all savings, discounts, rebates and credits, (3) an allowance of Contract Documents for overhead on
    items (1) and (2) above, and (4) an allowance per Contract Documents for profit on items (1), (2) and (3)
    above.

Should the parties hereto be unable to agree as to the value of the work to be changed, added or omitted, the Subcontractor shall proceed with the work promptly under the written order of Contractor from which order the stated value of the work shall be omitted, and the determination of the value of the work shall be referred to the Architect whose decision shall be final and binding upon the parties hereto.
    In the case of omitted work Contractor shall have the right to withhold from payments due or to become due to the Subcontractor an amount which, in Contractor's opinion, is equal to the value of such work until such time as the value thereof is determined by agreement or by the Architect as hereinabove provided.

All changes, additions or omissions in the Work ordered in writing by Contractor shall be deemed to be a part of the Work hereunder and shall be performed and furnished in strict accordance with all of the terms and provisions of this Agreement and the other Contract Documents. Subcontractor accepts the responsibility to keep its surety informed of all such modifications to its contract.  The obligations of Subcontractor and Subcontractor's Surety shall not be reduced, waived or adversely affected by the issuance of such change orders, additions or deductions even if subcontractor fails to inform surety of same and Contractor shall not be required to obtain consent of the surety to such modifications.

**Inspections and Defective Work**

Article X.  The Subcontractor shall at all times provide sufficient, safe and proper facilities for the inspection of the Work by Contractor, the Architect, and their authorized representatives in the field, at shops or at any other place where materials or equipment for the Work are in the course of preparation, manufacture, treatment or storage.  The Subcontractor shall, within twenty-four (24) hours after receiving written notice from Contractor to that effect, proceed to take down all portions of the Work and remove from the premises all materials whether worked or unworked, which the Architect or Contractor shall condemn as unsound,

4

Initials:

FORM 36 REV 2/12/01

defective or improper c    in any way failing to conform to this Agreemer    the Plans, Specifications or other Contract Documents, and the Sub ntractor, at its own cost and expense, shall replace    same with proper and satisfactory work and materials and make good all work damaged or destroyed by or as a result of such unsound, defective, improper or nonconforming work or materials or by the taking down, removal or replacement thereof.

**Failure to Prosecute, etc.**

Article XI.    Should the Subcontractor at any time, whether before or after final payment, refuse or neglect to supply a sufficiency of skilled workers or materials of the proper quality and quantity, or fail in any respect to prosecute the Work with promptness and diligence, or cause by any act or omission the stoppage, impede, obstruct, hinder or delay of or interference with or damage to the work of Contractor or of any other contractors or subcontractors on the Project, or fail in the performance of any of the terms and provisions of this Agreement or of the other Contract Documents, or should the Architect determine that the Work or any portion thereof is not being performed in accordance with the Contract Documents, or should there be filed by or against the Subcontractor a petition in bankruptcy or for an arrangement or reorganization, or should the Subcontractor become insolvent or be adjudicated a bankrupt or go into liquidation or dissolution, either voluntarily or involuntarily or under a court order, or make a general assignment for the benefit of creditors, or otherwise acknowledge insolvency, then in any of such events, each of which shall constitute a default hereunder on the Subcontractor's part, Contractor shall have the right, in addition to any other rights and remedies provided by this Agreement and the other Contract Documents or by law, after three (3) days written notice to the Subcontractor mailed or delivered to the last known address of the latter, (a) to perform and furnish through itself or through others any such labor or materials for the Work and to deduct the cost thereof from any monies due or to become due to the Subcontractor under this Agreement, and/or (b) to terminate the employment of the Subcontractor for all or any portion of the Work, enter upon the premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, all of which the Subcontractor hereby transfers, assigns and sets over to Contractor for such purpose, and to employ any person or persons to complete the Work and provide all the labor, services, materials, equipment and other items required therefor. In case of such termination of the employment of the Subcontractor, the Subcontractor shall not be entitled to receive any further payment under this Agreement until the Work shall be wholly completed to the satisfaction of Contractor and the Architect and shall have been accepted by them, at which time; if the unpaid balance of the amount to be paid under this Agreement shall exceed the cost and expense incurred by Contractor in completing the Work, such excess shall be paid by Contractor to the Subcontractor; but if such cost and expense shall exceed such unpaid balance, then the Subcontractor and its surety, if any, shall pay the difference to Contractor. Such cost and expense shall include, not only the cost of completing the Work to the satisfaction of Contractor and the Architect and of performing all labor, services, materials, equipment, and other items required therefor, but also all losses, damages, costs and expenses, (including legal fees and disbursements incurred in connection with reprocurement, in defending claims arising from such default and in seeking recovery of all such cost and expense from the Subcontractor and/or its surety), and disbursements sustained, incurred or suffered by reason of or resulting from the Subcontractor's default. Should Contractor take action by effectuating the provisions of this paragraph, and should it subsequently be determined that a termination effectuated by the terms of this Article was improper, such termination shall be treated as a termination for convenience pursuant to Article XX below.

It is recognized that if the Subcontractor institutes or has instituted against it a case under Title 11 of the United States Code (Bankruptcy Code), such event could impair or frustrate the Subcontractor's performance of this Agreement. Accordingly, it is agreed that upon the occurrence of any such event, Contractor shall be entitled to request of Subcontractor or its trustee or other successor adequate assurances of future performance. Failure to comply with such request within ten (10) days of delivery of the request shall entitle Contractor, in addition to any other rights and remedies provided by this Agreement or by law, to terminate this Agreement. Pending receipt of adequate assurances of performance and actual performance in accordance herewith, Contractor shall be entitled to perform and furnish through itself or through others any such labor, materials or equipment for the Work as may be necessary to maintain the progress of the Work and to deduct the cost thereof from any monies due or to become due to the Subcontractor under this Agreement. In the event of such bankruptcy proceedings, this Agreement shall terminate if the Subcontractor rejects this Agreement or if there has been a default and the Subcontractor is unable to give adequate assurance that it will perform as provided in this Agreement or otherwise is unable to comply with the requirements for assuming this Agreement under the applicable provisions of the Bankruptcy Code.

Subcontractor, in addition to any other rights available to Contractor hereunder, agrees to indemnify, hold harmless and defend Contractor from and against any and all claims, demands, suits, damages, judgments, liabilities, costs and expenses (including legal fees and disbursements) arising out of or related to (a) Subcontractor's breach of any term of the Agreement.

**Loss or Damage to Work**

Article XII.    Contractor shall not be responsible for any loss or damage to the Work to be performed and furnished under this Agreement, however caused, until after final acceptance thereof by Contractor and the Architect, nor shall Contractor be responsible for loss of or damage to materials, tools, equipment, appliances or other personal property owned, rented or used by the Subcontractor or anyone employed by it in the performance of the Work, however caused.

**Fire Insurance**

Contractor or Owner shall effect and maintain fire insurance (with extended coverage, if specified or otherwise required) upon all Work, materials and equipment incorporated in the Project and all materials and equipment on or about the Premises intended for permanent use or incorporation in the Project or incident to the construction thereof, the capital value of which is included in the cost of the Work, but not including any contractors' machinery, tools, equipment, appliances or other personal property owned, rented or used by the Subcontractor or anyone employed by it in the performance of the Work.

The total value of the property described above as insurable under this Article and as shown on the approved monthly requisition provided for in Article IV, plus the total value of similar property incorporated in the Project or delivered on the Premises during the month but not included in said requisition, as reported by the Subcontractor to Contractor for insurance purposes only, shall determine the total value of the Subcontractor's work, materials and equipment to be insured under this Article.

The maximum liability to the Subcontractor under this insurance shall be for not more than that proportion of any loss which the last reported value of the insured property bore to the actual value of said property at the time of such last report, and in no event for more than the actual loss.

5

Initials:

FORM 36 REV 2/12/01

In the event of ~ loss insured under this Article, the Subcontractor shall ~ · bound by any adjustment which shall be made between Contractor or t      wner and the insurance company or companies. Lc      any, shall be made payable to Contractor and/or the Owner, as then interests may appear, for the account of whom it may concern

**Cleaning Up**

Article XIII.  The Subcontractor shall, at its own cost and expense, (1) keep the Premises free at all times from all waste materials, packaging materials and other rubbish accumulated in connection with the execution of its Work by collecting and depositing said materials and rubbish in locations or containers as designated by Contractor from which it shall be removed by Contractor from the Premises without charge, (2) clean and remove from its own Work and from all contiguous work of others any soiling, staining, mortar, plaster, concrete or dirt caused by the execution of its Work and make good all defects resulting therefrom (3) at the completion of its Work in each area, perform such cleaning as may be required to leave the area "broom clean", and (4) at the entire completion of its Work, remove all of its tools, equipment, scaffolds, shanties and surplus materials.  Should the Subcontractor fail to perform any of the foregoing to Contractor's satisfaction, Contractor shall have the right to perform and complete such work itself or through others and charge the cost thereof to the Subcontractor.

**Compliance with Law and Permits**

Article XIV.  The Subcontractor shall obtain and pay for all necessary permits and licenses pertaining to the Work and shall comply with all federal, state, municipal and local laws, ordinances, codes, rules, regulations, standards, orders, notices and requirements, including but not limited to those relating to safety, discrimination in employment, fair employment practices or equal employment opportunity, and whether or not provided for by the Plans, Specifications, General Conditions, or other Contract Documents, without additional charge or expense to Contractor and shall also be responsible for and correct, at its own cost and expense, any violations thereof resulting from or in connection with the performance of its Work.  The Subcontractor shall at any time upon demand furnish such proof as Contractor may require showing such compliance and the correction of such violations.  The Subcontractor agrees to save harmless and indemnify Contractor from and against any and all loss, injury, claims, actions, proceedings, liability, damages, fines, penalties, costs and expenses, including legal fees and disbursements, caused or occasioned directly or indirectly by the Subcontractor's failure to comply with any of said laws, ordinances, rules, regulations, standards, orders, notices or requirements or to correct such violations therefore resulting from or in connection with the performance of Work.

**Labor to be Employed**

Article XV.  The Subcontractor shall not employ workers, means, materials or equipment which may cause strikes, work stoppages or any disturbances by workers employed by the Subcontractor, Contractor or other contractors or subcontractors on or in connection with the Work or the Project or the location thereof.  The Subcontractor agrees that all disputes as to jurisdiction of trades shall be adjusted in accordance with any plan for the settlement of jurisdictional disputes which may be in effect either nationally or in the locality in which the Work is being done and that it shall be bound and abide by all such adjustments and settlements of jurisdictional disputes, provided that the provisions of this Article shall not be in violation of or in conflict with any provisions of law applicable to the settlement of such disputes.  Should the Subcontractor fail to carry out or comply with any of the foregoing provisions, Contractor shall have the right, in addition to any other rights and remedies provided by this Agreement or the other Contract Documents or by law, after three (3) days written notice mailed or delivered to the last known address of the Subcontractor, to terminate this Agreement or any part thereof or the employment of the Subcontractor for all or any portion of the Work, and, for the purpose of completing the Work, to enter upon the Premises and take possession, in the same manner, to the same extent and upon the same terms and conditions as set forth in Article XI of this Agreement.

**Taxes and Contributions**

Article XVI.  The Subcontractor for the Price herein provided, hereby accepts and assumes exclusive liability for and shall indemnify, protect and save harmless Contractor and the Owner from and against the payment of:

1. All contributions, taxes or premiums (including interest and penalties thereon) which may be payable under the Unemployment Insurance Law of any State, Federal Social Security Act, Federal, State, County and/or Municipal Tax Withholding Laws, or any other law, measured upon the payroll of or required to be withheld from employees, by whomsoever employed, engaged in the Work to be performed and furnished under this Agreement.

2. All sales, use, personal property and other taxes (including interest and penalties thereon) required by any Federal, State, County, Municipal or other law to be paid or collected by the Subcontractor or any of its subcontractors or vendors or any other person or persons acting for, through or under it or any of them, by reason of the performance of the Work or the acquisition, ownership, furnishing or use of any materials, equipment, supplies, labor, services or other items for or in connection with the Work.

3. All pension, welfare, vacation, annuity and other union benefit contributions payable under or in connection with labor agreements with respect to all persons, by whomsoever employed, engaged in the Work to be performed and furnished under this Agreement.

In furtherance of, and in addition to the agreements, duties obligations and responsibilities of the Subcontractor with respect to the payment of sales, use, personal property and other taxes set forth in Articles IV and XVI of this Agreement, the Subcontractor agrees to reimburse and otherwise indemnify Contractor and the Owner for any expenses, including legal fees and litigation arising from, or related to the Subcontractor's failure to pay any sales, use, personal property or other taxes based upon labor, services, materials, equipment or other items acquired, performed, furnished or used for or in connection with the Work.

**Patents**

Article XVII.  The Subcontractor hereby agrees to indemnify, protect and save harmless Contractor and the Owner from and against any and all liability, loss or damage and to reimburse Contractor and the Owner for any expenses, including legal fees and disbursements, to which Contractor and the Owner may be put because of claims or litigation on account of infringement or alleged infringement of any letters patent or patent rights by reason of the Work or materials, equipment or other items used by the Subcontractor in its performance.

**Mechanics' Liens or Claims**

Article XVIII.  To the fullest extent permitted by law, Subcontractor for itself and for its subcontractors, laborers and materialmen and suppliers and all others directly or indirectly acting for, through or under it or any of them covenants and agrees that no liens or claims, whether a mechanics' lien or an attested account or otherwise, will be filed or maintained against the Project

6

FORM 36 REV 2/12/01

or Premises or any part thereof or any interests therein or any improvements ther~ n, or against any monies due or to become due from the Owner to Cor    or from Contractor to the Subcontractor, for or     Sccount of any work, labor, services, materials, supplies, equipment, or other items performed or furnished for or in connection with the Work, and the Subcontractor for itself and its Subcontractors, laborers, and materialmen and suppliers and all others above mentioned does hereby expressly waive, release and relinquish all rights to file or maintain such liens and claims and agrees further that this waiver of the right to file or maintain such liens and claims shall be an independent covenant and shall apply as well to work, labor and services performed and materials, supplies, equipment and other items furnished under any change order or supplemental agreement for extra or additional work in connection with the Project as to the Original Work covered by this Agreement.

If any subcontractor, laborer, materialman or supplier of the Subcontractor or any other person directly or indirectly acting for, through or under it or any of them files or maintains a lien or claim, whether a mechanics' lien or an attested account or otherwise, a mechanic's lien or claim against the Project or Premises or any part thereof or any interests therein or any improvements thereon or against any monies due or to become due from the Owner to Contractor or from Contractor to the Subcontractor, for or on account of any work, labor, services, materials, supplies, equipment or other items performed or furnished for or in connection with the Work or under any change order or supplemental agreement for extra or additional work in connection with the Project, the Subcontractor agrees to cause such liens and claims to be satisfied, removed or discharged at its own expense by bond, payment or otherwise within ten (10) days from the date of the filing thereof, and upon its failure to do so Contractor shall have the right, in addition to all other rights and remedies provided under this Agreement and the other Contract Documents or by law, to cause such liens or claims to be satisfied, removed or discharged by whatever means Contractor chooses, at the entire cost and expense of the Subcontractor (such cost and expense to include legal fees and disbursements). The Subcontractor agrees to indemnify, protect and save harmless Contractor and the Owner from and against any and all such liens and claims and actions brought or judgments rendered thereon, and from and against any and all loss, damages, liability, costs and expenses, including legal fees and disbursements, which Contractor and/or the Owner may sustain or incur in connection therewith.

**Assignment and Subletting**

Article XIX. To the fullest extent permitted by law, Subcontractor agrees that it shall not assign, sell, transfer, delegate or encumber any rights, duties or obligations arising under this Agreement including, but not limited to, any right to receive payments hereunder, without the prior written consent of Contractor in its sole discretion and the giving of any such consent to a particular assignment shall not dispense with the necessity of such consent to any further or other assignments. In the event Subcontractor assigns, sells, encumbers or otherwise transfers its right to any monies due or to become due under this Agreement as security for any loan, financing or other indebtedness (hereafter "Assignment"), notification to Contractor of such Assignment must be sent by certified mail, return receipt requested, to the Purchasing Manager in charge of the business unit responsible for the construction of the Project and the Assignment shall not be effective as against Contractor until Contractor provides its written consent to such Assignment. Subcontractor agrees that any such Assignment shall not relieve the Subcontractor of any of its agreements, duties, responsibilities or obligations under this Agreement and the other Contract Documents and shall not create a contractual relationship or a third party beneficiary relationship of any kind between Contractor and such assignee or transferee. Subcontractor further agrees that all of Contractor's defenses and claims arising out of this Agreement with respect to such Assignment are reserved unless expressly waived in writing by a duly authorized corporate officer. Subcontractor hereby agrees to indemnify and hold harmless Contractor from and against any and all loss, cost, expense or damages Contractor or Owner has or may sustain or incur in connection with such Assignment.

**Termination for Convenience**

Article XX. Contractor shall have the right at any time by written notice to the Subcontractor, to terminate this Agreement without cause and require the Subcontractor to cease work hereunder {, in which case, provided the Subcontractor be not then in default, Contractor shall indemnify the Subcontractor against any damage directly resulting from such termination}. In the event of such a termination for convenience, the Subcontractor shall be entitled to payment pursuant to the terms of the subcontract for all Work performed as of the date of termination, together with reasonable costs of demobilization and such other reasonable costs as may be encountered by the Subcontractor and directly attributable to such termination provided that such amount shall be reduced by all amounts for which Subcontractor is liable or responsible hereunder. However, the Subcontractor shall only be entitled to profit on that portion of the work actually performed and approved for payment to the date of termination together with retainages held upon payments made prior thereto. Subcontractor waives any claim for loss of anticipated profits or other damages in the event Contractor exercises this clause.

**Guarantees**

Article XXI. The Subcontractor hereby guarantees the Work to the full extent provided in the Plans, Specifications, General Conditions, Special Conditions and other Contract Documents.

The Subcontractor shall expeditiously remove, replace and/or repair at its own expense and at the convenience of the Owner any faulty, defective or improper Work, materials or equipment existing or discovered within one (1) year from the date of the acceptance of the Project as a whole by the Architect and the Owner or for such longer period as may be provided in the Plans, Specifications, General Conditions, Special Conditions or other Contract Documents.

Without limiting the generality of the foregoing, the Subcontractor warrants to the Owner, the Architect and Contractor, and each of them, that all materials and equipment furnished under this Agreement will be of first class quality and new, unless otherwise required or permitted by the other Contract Documents, that the Work performed pursuant to this Agreement will be free from defects and that the Work will strictly conform with the requirements of the Contract Documents. Work not conforming to such requirements, including substitutions not properly approved and authorized, shall be considered defective. All warranties contained in this Agreement and in the Contract Documents shall be in addition to and not in limitation of all other warranties or remedies required and/or arising pursuant to applicable law. Failure of Subcontractor to honor and satisfy the foregoing and any other warranties or guarantees required of the Subcontractor under the Contract Documents, shall constitute a default by Subcontractor.

**Accident Prevention**

Article XXII. The Subcontractor agrees that the prevention of accidents to workmen and property engaged upon or in the vicinity of the Work is its responsibility. The Subcontractor agrees to comply with all Federal, State, Municipal and local laws, ordinances, rules, regulations, codes, standards, orders, notices and requirements concerning safety as shall be applicable to the Work, including, among others, the Federal Occupational Safety and Health Act of 1970, as amended, and all standards, rules,

Project 9989B0
Account Codes: CCCS Code: **0880** / Phase Code: **08800(34)**
Contract 017 – WGG, Inc.

Initials:

FORM 36 REV 2/12/01

regulations and orders which have been or shall be adopted or issued thereunder and with the safety standards established during the progress of the Work by Contractor. When so ordered, the Subcontractor will stop any part of the Work which Contractor deems unsafe until corrective measures satisfactory to Contractor have been taken, and the Subcontractor agrees that it shall not have nor make any claim for damages growing out of such stoppages. Should the Subcontractor neglect to take such corrective measures, Contractor may do so at the cost and expense of the Subcontractor and may deduct the cost thereof from any payments due or to become due to the Subcontractor. Failure on the part of Contractor to stop unsafe practices shall in no way relieve the Subcontractor of its responsibility therefor.

This Subcontractor acknowledges the receipt of Contractor's "Safety, Health and Environmental Policy", "Drug and Alcohol Policy" and Sexual Harassment Policy". Subject to applicable law this Subcontractor further agrees to be bound to these policies as a part of the supplemental and special conditions to the contract for construction of the project.

In the event that hazardous substances of a type of which an employer is required by law to notify its employees are being used or stored on the site by the Subcontractor, the Subcontractor's sub-subcontractor and anyone directly or indirectly employed or otherwise retained by them or either of them, the Subcontractor shall immediately provide written notice of the chemical composition thereof (including, without limitation, a copy of the applicable Material Safety Data Sheet) to Contractor in sufficient time to permit compliance with such laws by Contractor, other subcontractors and other employers on the site. In the event that the Subcontractor encounters on the site material reasonably believed to be hazardous substances (including, without limitation, asbestos or polychlorinated biphenyl) which has not been rendered harmless, the Subcontractor shall immediately stop Work in the area affected and immediately report the condition to Contractor in writing. Work in the affected area shall resume when such hazardous substances have been rendered harmless or removed as determined by Contractor in its sole and absolute discretion. To the extent of Subcontractor's responsibilities hereunder, Subcontractor does indemnify and save harmless Contractor from and against any and all loss, injury, claims, actions, proceedings, liability, damages, fines, penalties, cost and expenses, including legal fees and disbursements, caused or occasioned directly or indirectly by the Subcontractor in regard to such hazardous substances.

**Liability for Damage and Personal Injury**

Article XXIII. The Subcontractor hereby assumes entire responsibility and liability for any and all damage or injury of any kind or nature whatever (including death resulting therefrom) to all persons, whether employees of any tier of the Subcontractor or otherwise, and to all property caused by, resulting from, arising out of or occurring in connection with the execution of the Work, or in preparation for the Work, or any extension, modification, or amendment to the Work by change order or otherwise. Except to the extent, if any, expressly prohibited by statute and excluding from this indemnity such acts or omissions, if any, of the party indemnified for which it is not legally entitled to be indemnified by the Subcontractor under applicable law, should any claims for such damage or injury (including death resulting therefrom) be made or asserted, whether or not such claims are based upon Contractor's or the Owner's alleged active or passive negligence or participation in the wrong or upon any alleged breach of any statutory duty or obligation on the part of Contractor or the Owner, the Subcontractor agrees to indemnify and save harmless Contractor and the Owner, their officers, agents, servants and employees from and against any and all such claims and further from and against any and all loss, cost, expense, liability, damage, penalties, fines or injury, including legal fees and disbursements, that Contractor and the Owner, their officers, agents, servants or employees may directly or indirectly sustain, suffer or incur as a result thereof and the Subcontractor agrees to and does hereby assume, on behalf of Contractor and the Owner, their officers, agents, servants and employees, the defense of any action at law or in equity which may be brought against Contractor and/or the Owner, their officers, agents, servants or employees upon or by reason of such claims and to pay on behalf of Contractor and the Owner, their officers, agents, servants and employees, upon demand, the amount of any judgment that may be entered against Contractor and/or the Owner, their officers, agents, servants or employees in any such action. In the event that any such claims, loss, cost, expense, liability, damage, penalties, fines or injury arise or are made, asserted or threatened against Contractor and/or the Owner, their officers, agents, servants or employees, Contractor shall have the right to withhold from any payments due or to become due to the Subcontractor an amount sufficient in its judgment to protect and indemnify Contractor and the Owner, their officers, agents, servants and employees from and against any and all such claims, loss, cost, expense, liability, damage, penalties, fines or injury, including legal fees and disbursements, or Contractor in its discretion may require the Subcontractor to furnish a surety bond satisfactory to Contractor guaranteeing such protection, which bond shall be furnished by the Subcontractor within five (5) days after written demand has been made therefor.

**Worker's Compensation and Liability Insurance**

In addition to Contractor and the Owner, the Indemnified Parties throughout this Agreement shall include:
and any of their respective officers, agents, servants, or employees, and affiliates, parents and subsidiaries.

In furtherance to but not in limitation of the indemnity provisions in this Agreement, Subcontractor hereby expressly and specifically agrees that its obligation to indemnify, defend and save harmless as provided in this Agreement shall not in any way be affected or diminished by any statutory or constitutional immunity it enjoys from suits by its own employees or from limitations of liability or recovery under worker's compensation laws.

Before commencing the Work, the following insurance coverages from insurance companies satisfactory to Contractor shall be in place and maintained until completion and final acceptance of the Work

1. WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE in accordance with laws of the State in which the Work is situated.

2. COMMERCIAL GENERAL LIABILITY INSURANCE INCLUDING COMPLETED OPERATIONS, CONTRACTUAL LIABILITY INSURANCE AGAINST THE LIABILITY ASSUMED HEREINABOVE, and including INDEPENDENT CONTRACTORS LIABILITY INSURANCE if the Subcontractor sublets to another all or any portion of the Work, Personal Injury Liability, Broad Form Property Damage (including completed operations), and Explosion, Collapse and Underground Hazards, with the following minimum limits:(Coverage shall be equivalent to ISO Occurrence Form 1996)

Combined Single Limit $ (3,000,000.00)

8

Initials:

FORM 36 REV 2/12/01

A)~~above insurance coverages shall be provided by insurance companies selected by the Subcontractor. costs are included in the Price and are to be paid by Subcontractor.~~

or

B) The above insurance coverages shall be provided through a consolidated insurance program arranged by Contractor. $17,691.00 (The "Insurance Cost") is included in the Price to pay for the premiums for the above insurance coverages for this Subcontractor and its sub-subcontractors. Subcontractor shall include this Insurance Cost in its Application(s) for Payment (which Applications are to be submitted to Contractor as provided herein) when and as directed by Contractor. Contractor will, when due, on behalf of the Subcontractor, make such payment by delivering the Insurance Cost (or the portion of the Insurance Cost that was included in the Application for Payment) to the relevant Worker's Compensation and General Liability insurance companies and Contractor will deliver the balance of the Application for Payment due for Work completed to the Subcontractor. Upon completion of the enrollment process in the consolidated insurance program , the Subcontractor and its sub-subcontractors will be provided with their own individual Worker's Compensation Policy by the consolidated insurance administrator and will be a named insured under the General Liability policy issued on the project on behalf of Contractor and its designated Subcontractors. The Subcontractor will incur a premium expense payable through Contractor for such premium and Subcontractor hereby commits to record these costs as outlined above. All executed change orders will include an additional premium for Worker's Compensation and General Liability as applicable and will be included in Applications for Payment submitted to Contractor, expensed by the Subcontractor and the premium paid by Subcontractor through Contractor, as outlined above.

or

~~C) The above insurance coverages shall be provided through an Owner Controlled Insurance Program (OCIP) as described in the Contract Documents.~~

Before commencing the Work, the Subcontractor shall procure and maintain, at its own expense, until completion and final acceptance of the Work at least the following insurance from insurance companies satisfactory to Contractor

3. COMMERCIAL AUTOMOBILE LIABILITY INSURANCE covering all owned, non-owned and hired automobiles used in connection with the Work, with the following minimum limits:

Bodily Injury (including death)  $ (1,000,000.00) per accident and Property Damage.

Before commencing the Work, the Subcontractor shall furnish a certificate, satisfactory to Contractor from each insurance company showing that (the above insurance is in force, stating policy numbers, dates of expiration, and limits of liability thereunder, and further providing that the insurance will not be canceled or changed until the expiration of at least thirty (30) days after written notice of such cancellation or change has been mailed to and received by Contractor. Contractor, the Owner and other entities as may be reasonably requested shall be named as an additional insured under these policies of insurance. It is expressly agreed and understood by and between Subcontractors and Contractor that the insurance afforded the additional insureds shall be primary insurance and that any other insurance carried by Contractor shall be excess of all other insurance carried by the Subcontractor and shall not contribute with the Subcontractor's insurance. Subcontractor further agrees to provide endorsements on its insurance policies which shall state the foregoing; however, Subcontractor's failure to provide such endorsement shall not affect Subcontractor's agreement hereunder.

If the Subcontractor fails to procure and maintain such insurance, if required, Contractor shall have the right, but not the obligation, to procure and maintain the said insurance for and in the name of the Subcontractor and the Subcontractor shall pay the cost thereof and shall furnish all necessary information to make effective and maintain such insurance or at Contractor's option, Contractor may offset the cost incurred by Contractor against amounts otherwise payable to Subcontractor hereunder.

**Bonds**
Article XXIV. The Subcontractor shall furnish to Contractor a performance bond in the amount of $$1,741,657.00 and a separate payment bond in the amount of $$1,741,657.00 the form and contents of such bonds and the Surety or Sureties thereon to be satisfactory to Contractor. Such bonds shall be furnished to Subcontractor within ten (10) calendar days after Subcontractor has executed this Agreement or within such other time period agreed to by Contractor in writing. In the event Subcontractor fails to furnish such bonds to Contractor within the time period as hereinabove provided, such failure shall constitute a default under this Agreement in which event Contractor shall have all of the rights and remedies provided in Article XI hereof with respect to default on the part of Subcontractor including, without limitation, the right to terminate this Agreement.

**Severability**
Article XXV. In the event that any provision or any part of a provision of this Agreement shall be finally determined to be superseded, invalid, illegal or otherwise unenforceable pursuant to applicable laws by an authority having jurisdiction, such determination shall not impair or otherwise affect the validity, legality, or enforceability of the remaining provisions or parts of provisions of this Agreement, which shall remain in full force and effect as if the unenforceable provision or part were deleted.

**Entire Agreement**
Article XXVI. This Agreement constitutes the entire agreement between the parties hereto. No oral representations or other agreements have been made by Contractor except as stated in the Agreement. This Agreement may not be changed in any way except as herein provided, and no term or provision hereof may be waived by Contractor except in writing signed by its duly authorized officer or agent. Subcontractor acknowledges and represents that it completed and submitted to Contractor a prequalification questionnaire, that all statements therein were true, accurate and complete, and remain true, accurate and complete, and that Contractor has relied on such statements in deciding to enter into this Agreement. The marginal descriptions of any term or provision of this Agreement are for convenience only and shall not be deemed to limit, restrict or alter the content, meaning or effect thereof.

The said parties, for themselves, their heirs, executors, administrators, successors and assigns, do hereby agree to the

9

Project 9989B0
Account Codes: CCCS Code: **0880** / Phase Code: **08800(34)**
Contract 017 – WGG, Inc.

Initials:

FORM 36 REV 2/12/01

full performance of all of       erms and provisions herein contained.

In Witness Whereof the parties to these presents have hereunto set their hands as of the day and year first above written.

WGG, Inc.

By: _____

Official Title: _____

Witness: _____

By: _____    Tompkins Builders, Inc.

John G. Madden, Vice President of Purchasing

Witness: _____

Subcontractor's State Unemployment Ins. No.    PA - 38-12693
   (Insert State and Register No. for State in which the Work is to be performed)

Subcontractor's License No.    233449
   (Insert License No., if any, for State or locality in which the Work is to be performed)

Subcontractor's State Sales Tax Registration No.    PA - 82455838

## INDEX

|  | Subcontract General Provisions | Pages | 1-10 |
| AP – 1 | Scope of Work | Page(s) | 2 |
| AP – 2 | Contract Documents | Page(s) | 9 |
| AP- 2.1 | Contract Documents | Page(s) | 8 |
| AP-2.2 | Contract Documents | Page(s) | 10 |
| AP – 3 | Prices | Page(s) | 2 |
| AP – 4 | Insurance Requirements | Page(s) | 1 |
| AP – 5 | Special Provisions | Page(s) | 1 |
| AP – 6 | Supplementary Provisions | Page(s) | 4 |

Project 9989B0
Account Codes: CCCS Code: 0880 / Phase Code: 08800(34)
Contract 017 – WGG, Inc.

Initials: 

### CAPITOL HILLS TOWER
### <u>SCOPE OF WORK</u> – Glass and Glazing

The Work, as defined in Article 1, includes but is not limited to the following description, which appears as a general guideline and is not intended to represent each and every item necessary to perform the Work.

The work, as defined in Article 1, shall consist of all **<u>Glass, Glazing, Storefronts, Aluminum Windows, Sliding Glass Doors, Metal Framed Skylights, Canopy and Unframed Mirrors</u>** and related work in the accordance with the agreement between the Owner and Contractor, Project Drawings, Specifications and Addenda 1, 2, 3, and 4, all of which are prepared by Gordon and Greenberg Architects, SKG Architects and Planners, LLC. VIKA Incorporated, Civil Engineers, and listed in AP-2, including, without limitations, the following:

Geo Technical Engineers Report dated 12/08/02 prepared by Schnabel Engineering.
Clark Foundation Sheeting and Shoring drawings dated June 24, 2003; for reference only.
Richter and Associates designed drawings for PEPCO Electrical Service; dated January 1, 2003; for reference only.

    Specification Section:
           <u>Marriott Courtyard</u>
           07920 – Sealants and Caulking
           08410 – Aluminum Entrances and Storefronts
           08460 – Automatic Entrance Doors
           08520 – Aluminum Windows
           08710 – Finish Hardware (As related here in)
           08800 - Glazing

           <u>Capitol Hill Towers</u>
           07900 – Joint Sealers
           08410 – Metal-Framed Storefronts
           08525 – Aluminum Windows and Sliding Glass Doors
           08630 - Metal Framed Skylights
           08710 – Door Hardware (As related here in)
           08800 – Glazing
           08830 - Mirrors

In addition to all other requirements this Subcontract includes the following:

Although this Subcontract only includes the scope of work for the Capitol Hill Tower project, the scope of work for the Marriott Hotel project included in the subcontract agreement between the Contractor and Subcontractor dated <u>11/2/04</u> is incorporated by reference and any and all performance issues, additional costs or delays, etc. resulting under either project caused by the other will not form the basis of a claim by Subcontractor for additional costs or delays under either Subcontract. The projects have been separated into two contracts for administrative purposes only. With respect to the performance of the work, the parties to these subcontracts acknowledge and agree that the combined scopes of work under these two projects, in effect, require the performance of one project. Subcontract # 9989AO – 017 agreement is included by reference in its entirety.

Subcontract No. <u>9989B0-017</u>

           INITIAL

1. Provide all aluminum entrances, aluminum storefronts, automatic doors, aluminum windows, skylights, glass and glazing, and related work.

2. This subcontractor will inspect all window openings with Contractor prior to scheduled installation and advise of any discrepancies

3. Provide exterior caulking and sealing contiguous to Subcontractors work. This Subcontractor agrees to utilize Tremco or Pecora sealants as directed by the contractor.

4. Provide all unframed mirrors as shown and specified.

5. Provide mock ups as required.

6. Subcontractor to leave out windows as required for the Installation of trash chutes and for stocking materials at no additional cost to the Contractor.

7. Provide all flashing and counter flashing associated with the Scope of Work.

8. Provide all finish hardware associated with the Scope of Work.

9. Provide all attachments, anchors, shims, fasteners and loose hardware required for anchorage of storefront, skylight, window systems, sliding glass doors, mirrors, canopies and glass.

10. Perform all specified tests for the Work of this Subcontract. In addition, 3 window assemblies with the spray tested by this subcontractor.

11. Provide skylight with integral condensation collection and guttering system including pressure glazing system.

12. Provide all glazing for all vision lights in doors and miscellaneous interior glazing.

13. Provide the glass and aluminum at entrance canopy as shown and as specified in the Contract Documents. The work excludes the structural steel frame as shown on the structural drawings, however the work includes aluminum cladding, aluminum tubes and glass as detailed on 5/A6.04 of the documents.

14. Provide glass at handrail detailed on 1/A 8.00 and at Buffet detailed on A9.11 & 4/A 10.06

15. Subject to the provisions of base agreement, the following durations and sequencing of the work as they appear in the present project schedule.
    a) Shop Drawings, Product Data and Samples six (6) weeks after award
    b) Delivery of windows, skylights, storefronts Twelve (12) weeks after approval.
    c) Install Hotel Unit Windows: 4 days per floor. (Concurrent with the Apartment Building)
    d) Install Apartment Unit Windows and Doors: 6 days per floor (concurrent with the Hotel windows).
    e) Install Apartment Mirrors. 2 Days per Floor.

Subcontract No. 9989B0-017

Page 2 of 2

AP-1

INITIAL

## Capitol Hill Towers Project Drawing List
### Prepared by: SKG Architects and Planners, LLC

**COVER SHEET**
A0.01          Cover Sheet

**CIVIL   Drawings Prepared By Vika, Incorporated**

| DWG# | Drawing Name | Last Revision |
|------|--------------|---------------|
| C1.01 | Existing Condition and Demolition Plan | 04/10/2003 |
| C2.01 | Site Plan | 04/10/2003 |
| C2.02 | Site Details | 04/10/2003 |
| C2.03 | Site Details and Notes | 04/10/2003 |
| C3.01 | Sediment & Erosion Control Notes | 04/10/2003 |
| C3.02 | Sediment & Erosion Control Notes | 04/10/2003 |
| C3.03 | Sediment & Erosion Control Details | 04/10/2003 |
| C4.01 | Sand Filter Details & SWM Notes | 04/10/2003 |
| C5.01 | Landscape Plan | **Not issued** |

**Sheeting and Shoring Permitted Drawings (For Reference Only)**

| | |
|---|---|
| Cover Sheet | 06/24/03 |
| SE – 1 | 06/24/03 |
| SE – 2 | 06/24/03 |
| SE – 3 | 08/14/03 |
| SE – 4 | 08/14/03 |
| SE – 5 | Not Issued |
| SE – 6 | 06/24/03 |

**Richter and Associates Drawings (For Reference Only)**

| | |
|---|---|
| Sheet 1 of 2 | 01/09/03 |
| Sheet 2 of 2 | 01/09/03 |

**LANDSCAPING  Drawings prepared by Workshop**

| DWG# | Drawing Name | Last Revision |
|------|--------------|---------------|
| L0.0 | Landscaping Index Sheet | 08/20/2002 |
| L1.0 | Streetscape Layout, West Half | 08/20/2002 |
| L1.1 | Streetscape Layout, East Half | 08/20/2002 |
| L1.2 | Streetscape Planting Plan West Half | 08/20/2002 |
| L1.3 | Streetscape Planting Plan East Half | 08/20/2002 |
| L1.4 | Streetscape Details | 08/20/2002 |
| L1.5 | Streetscape Details | 08/20/2002 |
| L1.6 | Streetscape Details (Blank Sheet) | 08/20/2002 |
| L2.0 | Courtyard Layout Plan | 08/20/2002 |
| L2.1 | Courtyard Grading Plan | 08/20/2002 |
| L2.2 | Courtyard Planting Plan | 08/20/2002 |
| L2.3 | Courtyard Paving Details | 08/20/2002 |
| L2.4 | Courtyard Paving Details | 08/20/2002 |
| L2.5 | Courtyard Arbor Details | 08/20/2002 |
| L2.6 | Courtyard Arbor Details | 08/20/2002 |
| L2.7 | Courtyard Fountain Details | 08/20/2002 |
| L2.8 | Courtyard Fountain Mechanical Details | 08/20/2002 |
| L2.9 | Courtyard Planter Wall Details | 08/20/2002 |
| L2.10 | Courtyard Planter Wall Details | 08/20/2002 |
| L2.11 | Courtyard Planting Plan | 08/20/2002 |
| L2.12 | Courtyard Planting Details | 08/20/2002 |
| L3.0 | Landscape Lighting Diagram | 08/20/2002 |
| L3.1 | Landscape Lighting Details | 08/20/2002 |
| L3.2 | Landscape Soil Placement Diagram | 08/20/2002 |
| L3.3 | Landscape Irrigation Diagram | 08/20/2002 |

INITIAL

**ARCHITECTURAL     Drawings prepared by SK&I Architectural Design Group, LLC**

| DWG# | Drawing Name | Last Revisions |
|---|---|---|
| A0.01 | Cover Sheet/ Drawing List | 08/13/2003 |
| A0.02 | General Notes/Abbr./Unit Analysis | 08/09/2002 |
| A0.03 | Code Analysis Garage G1 & G2 | 08/09/2002 |
| A0.04 | Code Analysis Lobby & Partial 2nd Floor Levels | 08/09/2002 |
| A0.05 | Code Analysis Typical (2nd-10th) & | 08/09/2002 |
|  | 11th-13th Floor Level Plans |  |
| A0.06 | Code Analysis Upper Roof Plan & | 08/09/2002 |
|  | Occupant Loads |  |
| A1.01 | 1/8" Column Layout G2 Level | 08/09/2002 |
| A1.02 | 1/8" Column Layout G1 Level | 08/09/2002 |
| A1.03 | 1/8" Column Layout Lobby Level | 08/09/2002 |
| A1.03A | Partial column/slab layout plans for 2nd/3rd floor slab | 08/09/2003 |
| A1.04 | 1/8" Column Layout Typical Level | 08/09/2002 |
| A1.05 | 1/8" Column Layout 11 to 13 Level | 08/09/2002 |
| A1.06 | 1/8" Column Layout Roof Level | 08/09/2002 |
| A2.01 | 1/8" G2 Level Floor Plan | 08/09/2002 |
| A2.02 | 1/8" G1 Level Floor Plan | 08/09/2002 |
| A2.03 | 1/8" Lobby Level Floor Plan | 08/09/2002 |
| A2.03a | 1/8" Partial 2nd Level Floor Plan | 08/09/2002 |
| A2.04 | 1/8" Typical Level Floor Plan | 08/09/2002 |
| A2.05 | 1/8" 11th to 13th Level Floor Plan | 08/09/2002 |
| A2.06 | 1/8" Roof Level Floor Plan | 08/09/2002 |
| A3.01 | 1/4" Unit Floor Plans | 08/09/2002 |
| A3.02 | 1/4" Unit Floor Plans | 08/09/2002 |
| A3.03 | 1/4" Unit Floor Plans | 08/09/2002 |
| A3.04 | 1/4" Unit Floor Plans | 08/09/2002 |
| A3.05 | 1/4" Unit Types @ 11 to 13 Levels | 08/09/2002 |
| A3.06 | 1/4" Unit Types @ 11 to 13 Levels | 08/09/2002 |
| A3.07 | 1/4" Lobby Level Floor Plan | 08/09/2002 |
| A3.08 | 1/4" Lobby Level Floor Plan | 08/09/2002 |
| A3.09 | Stairs Plans and Sections | 08/09/2002 |
| A3.10 | Stair Plans, Sections and Details | 08/09/2002 |
| A3.11 | Elevator Plans & Sections | 08/09/2002 |
| A3.12 | Sections | 08/09/2002 |
| A4.01 | 1/8" Building Sections | 08/09/2002 |
| A4.02 | 1/8" Building Sections | 08/09/2002 |
| A4.03 | 1/8" Building Sections | 08/09/2002 |
| A4.04 | 1/8" Ramp Sections | 08/09/2002 |
| A5.01 | 1/8" Building Elevation | 08/09/2002 |
| A5.02 | 1/8" Building Elevation | 08/09/2002 |
| A5.03 | 1/8" Building Elevation | 08/09/2002 |
| A5.04 | 1/8" Building Elevation | 08/09/2002 |
| A5.05 | 1/8" Building Elevation | 08/09/2002 |
| A5.06 | Partial Elevation | 08/09/2002 |
| A5.07 | Partial Elevation | 08/09/2002 |
| A5.08 | Partial Elevation | 08/09/2002 |
| A6.01 | Sections & Details | 08/09/2002 |
| A6.02 | Sections & Details | 08/09/2002 |
| A6.03 | Sections & Details | 08/09/2002 |
| A6.04 | Sections & Details | 08/09/2002 |
| A6.05 | Sections & Details | 08/09/2002 |
| A6.06 | Sections & Details | 08/09/2002 |
| A6.07 | Sections & Details | 08/09/2002 |
| A6.08 | Shaft Details | 08/09/2002 |
| A6.09 | Sections & Details | 08/09/2002 |
| A6.10 | Sections & Details | 08/09/2002 |
| A6.11 | Sections & Details | 08/09/2002 |

Subcontract No. 9989B0-017

INITIAL

| A7.01 | Wall Assemblies | 08/09/2002 |
| A7.02 | Window Schedule | 08/09/2002 |
| A7.03 | Window, Door & Storefronts Schedule | 08/09/2002 |
| A7.04 | Door Schedule & Notes | 08/09/2002 |
| A7.05 | Signage Schedule | 08/09/2002 |
| A8.01 | Bathroom Elevations | 08/09/2002 |
| A8.02 | Bathroom Elevations | 08/09/2002 |
| A8.03 | Bathroom Elevations | 08/09/2002 |
| A8.04 | Kitchen Elevations | 08/09/2002 |
| A9.01 | Reflected Ceiling Plan - Typical Floor | 08/09/2002 |
| A9.02 | Reflected Ceiling Plan - Typical Floor | 08/09/2002 |
| A9.03 | Reflected Ceiling Plan - 10th Floor | 08/09/2002 |
| A9.04 | Reflected Ceiling Plan - 11th-13th Floor | 08/09/2002 |

**STRUCTURAL Drawings prepared by Tadjer-Cohen-Edelson Associates**

| DWG# | Drawing Name | Last Revision |
|---|---|---|
| S1.01 | Foundation and G2 Level Framing Plan | 08/09/2002 |
| S1.02 | G1 Level Framing Plan | 08/09/2002 |
| S1.03 | Ground Floor Framing Plan | 08/09/2002 |
| S1.04 | Second Floor Framing Plan | 08/09/2002 |
| S1.05 | 3rd Floor Framing Plan | 08/09/2002 |
| S1.06 | 4th Floor Framing Plan | 08/09/2002 |
| S1.07 | Typical Floor Framing Plan 5th, 7th & 9th Floor | 08/09/2002 |
| S1.08 | 6th & 8th Floor Framing Plan | 08/09/2002 |
| S1.09 | 10th Floor Framing Plan | 08/09/2002 |
| S1.10 | 11th Floor Framing Plan | 08/09/2002 |
| S1.11 | 12th Floor Framing Plan | 08/09/2002 |
| S1.12 | 13th Floor Framing Plan | 08/09/2002 |
| S1.13 | Roof & Penthouse Floor Framing Plan | 08/09/2002 |
| S1.14 | Elevator M/R & M/R Roof Framing Plan | 08/09/2002 |
| S2.01 | Column Schedule | 08/09/2002 |
| S2.02 | Column Schedule | 08/09/2002 |
| S2.03 | Column Schedule | 08/09/2002 |
| S2.04 | Beam Schedule | 08/09/2002 |
| S3.01 | Sections and Details | 08/09/2002 |
| S3.02 | Sections and Details | 08/09/2002 |
| S3.03 | Sections and Details | 08/09/2002 |
| S3.04 | Sections and Detail | 08/09/2002 |
| S3.05 | Stairs | 08/09/2002 |
| S3.06 | Sections and Details | 08/09/2002 |
| S3.07 | Sections and Details | 08/09/2002 |
| S3.08 | Sections and Details | 08/09/2002 |
| S4.01 | Typical Details | 08/09/2002 |
| S4.02 | Typical Details and Structural Notes | 08/09/2002 |

**MECHANICAL Drawings prepared by Mendosa, Ribas, Faunas and Associates**

| DWG# | Drawing Name | Last Revision |
|---|---|---|
| M-01 | Partial G2 Floor Plan | 08/09/2002 |
| M-02 | Partial G2 Floor Plan | 08/09/2002 |
| M-03 | Partial G1 Floor Plan | 08/09/2002 |
| M-04 | Partial G1 Floor Plan | 08/09/2002 |
| M-05a | Ground Floor Plan | 08/09/2002 |
| M-05b | Ground Floor Plan | 08/09/2002 |
| M-05c | Ground Floor Plan | 08/09/2002 |
| M-05d | Ground Floor Plan | 08/09/2002 |
| M-06a | Typical Floor Plan | 08/09/2002 |
| M-06b | Typical Floor Plan | 08/09/2002 |
| M-06c | Typical Floor Plan | 08/09/2002 |
| M-07a | 10th Floor Plan | 08/09/2002 |
| M-07b | 10th Floor Plan | 08/09/2002 |

Subcontract No. 9989B0-017

INITIAL

| | | |
|---|---|---|
| M-07c | 10th Floor Plan | 08/09/2002 |
| M-08a | 11-13 Floor Plan | 08/09/2002 |
| M-08b | 11-13 Floor Plan | 08/09/2002 |
| M-08c | 11-13 Floor Plan | 08/09/2002 |
| M-09 | Roof Floor Plan | 08/09/2002 |
| M-10 | Dryers Exhaust Riser Diagram HVAC | 08/09/2002 |
| M-11 | Toilet Exhaust Riser Diagram HVAC | 08/09/2002 |
| M-12 | Corridor & Stair Pressurization Riser Diagram HVAC | 08/09/2002 |
| M-13 | Details HVAC | 08/09/2002 |
| M-14 | Details HVAC | 08/09/2002 |
| M-15 | Details HVAC | 08/09/2002 |
| M-16 | Schedules HVAC | 08/09/2002 |
| M-17 | Schedules HVAC | 08/09/2002 |

| **PLUMBING** | **Drawings prepared by Mendosa, Ribas, Faunas and Associates** | |
|---|---|---|
| **DWG#** | **Drawing Name** | **Last Revision** |
| P-1 | Garage Level 2 North Floor Plan | 08/09/2002 |
| P-2 | Garage Level 2 South Floor Plan | 08/09/2002 |
| P-3 | Garage Level 1 North Floor Plan | 08/09/2002 |
| P-4 | Garage Level 1 South Floor Plan | 08/09/2002 |
| P-5 | Lobby Level Floor Plan | 10/03/2002 |
| P-6 | Second Floor Plan | 08/09/2002 |
| P-7 | Typical (3rd-10th) Floor Plan | 08/09/2002 |
| P-8 | Eleventh Floor Plan | 08/09/2002 |
| P-9 | 12th and 13th Floor Plan | 08/09/2002 |
| P-10 | Roof Plan | 08/09/2002 |
| P-11 | Typical Units Floor Plan | 08/09/2002 |
| P-12 | Typical Units Floor Plan | 08/09/2002 |
| P-13 | Fixture Schedule & Details | 10/03/2002 |
| P-14 | Sanitary Riser Diagrams | 08/09/2002 |
| P-15 | Sanitary Riser Diagrams | 08/09/2002 |
| P-16 | Storm Riser Diagrams | 08/09/2002 |
| P-17 | Fire Standpipe Riser Diagrams | 08/09/2002 |
| P-18 | Domestic Water Riser Diagrams | 10/03/2002 |
| P-19 | Sanitary Building Drain Riser Diagrams | 10/03/2002 |
| P-14 a | Gordon &Greenberg Storm Riser Diag. both bldg | **See Hotel Dwgs.** |

| **ELECTRICAL** | **Drawings prepared by Mendosa, Ribas, Faunas and Associates** | |
|---|---|---|
| **DWG#** | **Drawing Name** | **Last Revision** |
| E-01 | Symbols and Notes | 10/03/2002 |
| E-02 | Partial G-2 Floor Plan | 10/03/2002 |
| E-03 | Partial G-2 Floor Plan | 10/03/2002 |
| E-04 | Partial G-1 Floor Plan | 10/03/2002 |
| E-05 | Partial G-1 Floor Plan | 10/03/2002 |
| E-06 | Lobby Level Floor Plan Lighting | 10/03/2002 |
| E-07 | Lobby Level Floor Plan Power | 10/03/2002 |
| E-08 | 2nd thru 10th Typical Floor Plan | 10/03/2002 |
| E-09 | 11th-13th Floor Plan | 10/03/2002 |
| E-10 | Roof Floor Plan | 10/03/2002 |
| E-11A | 1/4" Units Floor Plan | 10/03/2002 |
| E-11B | Units Floor Plan | 10/03/2002 |
| E-11C | Units Floor Plan | 10/03/2002 |
| E-12A | Units Floor Plan | 10/03/2002 |
| E-12B | Units Floor Plan | 10/03/2002 |
| E-13 | Units Power Riser Diagram | 10/03/2002 |
| E-14 | Building Power Riser Diagram | 10/03/2002 |
| E-15 | Panel Board Schedules | 10/03/2002 |
| E-15a | Panel Board Schedules | 10/03/2002 |
| E-16 | Schedules & Details | 10/03/2002 |

Subcontract No. 9989B0-017

INITIAL

| E-17 | Building Single Line & Elevations | 10/03/2002 |
| E-18 | Fire Alarm Riser Diagram | 10/03/2002 |
| E-19 | Cable TV and Telephone Diagrams | 10/03/2002 |
| E-20 | Garage Plan Level G1 Fire Alarm | 04/23/2003 |
| E-21 | Garage Plan Level G2 Fire Alarm | 04/23/2003 |

**INTERIOR DESIGN     Drawings prepared by Leslie Gil Archicts**

| DWG# | Drawing Name | Last Revision |
|------|-------------|---------------|
| ID-01 | 1st Flr. Lobby Public Spaces Paving Plan | 08/09/2002 |
| ID-02 | 1st Flr. Lobby Public Spaces Reflected Ceiling Plan | 08/09/2002 |
| ID-03 | 1st Flr. Lobby Public Spaces Power, Telephone Data | 08/09/2002 |
| ID-04 | Elevation: Lobby, Party Room, and Mail Room | 08/09/2002 |
| ID-05 | Finish and Specialties Schedules | 08/09/2002 |
| ID-06 | 1/4" Plan: Lobby Level | 08/09/2002 |
| ID-07 | 1/4" Plan/Section/Elevation: Reception Desk/ Cabinet Niche | 08/09/2002 |
| ID-08 | 1/4" Plan Detail: Lobby Level | 08/09/2002 |
| ID-09 | 1/4" Section Detail: Lobby Level | 08/09/2002 |
| ID-10 | 1/4" Plan/Section Detail: Reception Desk/ Cabinet Niche | 08/09/2002 |
| ID-11 | 1/8" Elevator 1, 2 Plan and Details | 08/09/2002 |

| ADDENDUM #1 | DATED 09/06/02 |
| ADDENDUM # 2 | DATED 09/10/02 |
| ADDENDUM #3 | DATED 09/18/02 |
| ADDENDUM #4 | DATED 10/07/02 |
| ATTACHMENTS | - RFI – Group 1, 2,3,4, - 09/24/02; 7,8 - 10/02/02; 9,10,11 - 10/10/02 |
| | - Wage Scale – General Decision: DC 20030003 dated 10/03/03 – DC 3 (Modification #1) |
| | - LSDBE Memorandum of Understanding between Owner and the District of Columbia |
| | - First Source Employment Agreement |
| | - HUD –2554 (2/2002) Supplement Conditions of the Contract for Construction |
| | - HUD-92442-A (11/00) Construction Contract Cost Plus Between Owner and Contractor |

**BIDDING REQUIREMENTS, CONTRACT FORMS AND CONDITIONS OF THE CONTRACT - DATED 08/09/02**

| 00002 | Project Directory |
| 00007 | Seals Page |
| 00010 | Table Of Contents |
| 00300 | Information Available To Bidders |
| 00410 | Bid Bond (AIA Document A312, 1984) |
| 00615 | Performance Bond and Payment Bond |
| 00700 | General Conditions (AIA Document A201, 1997) |
| 00800 | Supplementary Conditions |
| 00810 | U.S. Dept. of Housing and Urban Development Supplementary Conditions |
| 00820 | U.S. Dept. of Housing and Urban Development-Wage Rates |

**SPECIFICATIONS**

**DIVISION 1     GENERAL REQUIREMENTS**

| 01100 | Summary |
| 01200 | Price and Payment Procedures |
| 01230 | Alternates |

INITIAL

| 01230 | Alternates |
| 01270 | Unit Prices |
| 01300 | Administrative Requirements |
| 01325 | Construction Progress Schedule |
| 01400 | Quality Requirements |
| 01410 | Regulatory Requirements |
| 01420 | Abbreviations and Definitions |
| 01425 | Reference Standards |
| 01500 | Temporary Facilities and Controls |
| 01563 | Tree and Plant Protection |
| 01600 | Product Requirements |
| 01700 | Execution Requirements |
| 01780 | Closeout Submittals |
| 01810 | Commissioning |

**DIVISION 2**        **SITE CONSTRUCTION**

| 02050 | Demolition |
| 02230 | Site Clearing |
| 02260 | Excavation Support and Protection |
| 02310 | Grading |
| 02315 | Excavation |
| 02316 | Fill and Backfill |
| 02317 | Trenching for Site Utilities |
| 02361 | Soil Treatment for Termite Control |
| 02370 | Sediment and Erosion Control |
| 02468 | Drilled Concrete Piers (Cassions) |
| 02510 | Water Distribution |
| 02515 | Disinfection of Water Distribution System |
| 02535 | Sanitary Sewer Piping |
| 02551 | Site Gas Distribution |
| 02582 | Underground Electrical Ducts and Manholes |
| 02620 | Subdrainage |
| 02635 | Storm Drainage Piping |
| 02640 | Manholes and Covers |
| 02721 | Aggregate Base Course |
| 02741 | Bituminous Concrete Paving (For Roadway Repair) |
| 02751 | Portland Cement Concrete Paving |
| 02751 | Concrete Paving (Added by Addendum 2) |
| 02760 | Pavement Marking |
| 02780 | Unit Pavers (Added by Addendum 2) |
| 02783 | Pavers |
| 02810 | Landscape Irrigation |
| 02813 | Landscape Irrigation (Added by Addendum 2) |
| 02822 | Ornamental Metal Fences and Gates |
| 02870 | Site and Street Furnishings |
| 02900 | Plantings and Planting Soil (Added by Addendum 2) |
| 02910 | Topsoil and Tillage |
| 02923 | Sodding |

INITIAL

| 02930 | On-Structure Exterior Plantings and Soils |
|---|---|
| **DIVISION 3** | **CONCRETE** |
| 03100 | Concrete Forms and Accessories |
| 03200 | Concrete Reinforcement |
| 03300 | Cast-In-Place Concrete |
| 03386 | Post-Tensioned Structural Concrete |
| 03450 | Precast Architectural Concrete (Added by Addendum 2) |
| **DIVISION 4** | **MASONRY** |
| 04065 | Mortar and Masonry Grout |
| 04230 | Calcium Silicate Masonry Units |
| 04720 | Architectural Cast Stone |
| 04810 | Unit Masonry Assemblies |
| 04810 | Dimensioned Granite Masonry (Added by Addendum 2) |
| **DIVISION 5** | **METALS** |
| 05120 | Structural Steel |
| 05400 | Cold-Formed Metal Framing |
| 05500 | Metal Fabrications |
| 05500 | Iron Wicket (Added by Addendum 2) |
| 05510 | Metal Stairs |
| 05700 | Ornamental Metal |
| **DIVISION 6** | **WOOD AND PLASTICS** |
| 06100 | Rough Carpentry |
| 06130 | Specialty site Timber Construction (Added by Addendum 2) |
| 06200 | Finish Carpentry |
| 06423 | Wood Veneer Faced Paneling |
| 06620 | Cast Plastic Fabrications |
| **DIVISION 7** | **THERMAL AND MOISTURE PROTECTION** |
| 07110 | Sheet membrane Waterproofing (Modified Bituminous) Vertical Wall Surface |
| 07111 | Fluid Applied Waterproofing (Hot Applied Rubberized Asphalt) Horizontal Slab Surfaces |
| 07115 | Bituminous Dampproofing |
| 07170 | Bentonite Waterproofing |
| 07185 | Pedestrian Traffic Membrane |
| 07212 | Board and Batt Insulation |
| 07240 | Exterior Insulation and Finish System |
| 07243 | Direct Applied Exterior Finish System |
| 07556 | Rubberized Asphalt Roofing |
| 07620 | Sheet Metal Flashing and Trim |
| 07830 | Roof Hatch |
| 07840 | Firestopping |
| 07900 | Joint Sealers |
| **DIVISION 8** | **DOORS AND WINDOWS** |

Subcontract No. 9989B0-017

AP –2

INITIAL 

| | |
|---|---|
| 08110 | Steel Doors and Frames |
| 08211 | Wood Doors |
| 08310 | Access Doors and Panels |
| 08331 | Overhead Coiling Doors |
| 08410 | Metal-Framed Storefronts |
| 08525 | Aluminum Windows and Sliding Glass Doors |
| 08630 | Metal-Framed Skylights |
| 08710 | Door Hardware |
| 08800 | Glazing |
| 08830 | Mirrors |

| | |
|---|---|
| **DIVISION 9** | **FINISHES** |
| 09220 | Portland Cement Plaster |
| 09260 | Gypsum Board Assemblies |
| 09300 | Tile |
| 09309 | Swimming Pool Tile |
| 09450 | Stone Facing (Granite and Marble) |
| 09511 | Suspended Acoustical Ceilings |
| 09545 | Doweled Grille Wood Wall |
| 09600 | Stone Floor and Wall Tile (Marble) |
| 09641 | Hardwood Flooring – Adhesive Applied |
| 09650 | Resilient Flooring |
| 09680 | Carpet |
| 09720 | Wall Covering |
| 09805 | Textured Ceiling Coatings (Interior of Unit) |
| 09820 | Polymerized Cementitious Coating (Underside of Balcony Coating) |
| 09900 | Paints and Coatings |
| 09960 | High-Performance Coatings |

| | |
|---|---|
| **DIVISION 10** | **SPECIALTIES** |
| 10170 | Plastic Toilet Specialties |
| 10441 | Signage |
| 10500 | Lockers |
| 10523 | Fire Extinguishers and Accessories |
| 10552 | Mailboxes |
| 10800 | Toilet, Bath and Laundry Accessories |
| 10900 | Wardrobe and Closet Specialties |

| | |
|---|---|
| **DIVISION 11** | **EQUIPMENT** |
| 11014 | Window Washing Equipment |
| 11150 | Parking Control Equipment |
| 11165 | Dock Bumpers |
| 11172 | Waste Compactors |
| 11450 | Residential Equipment |

| | |
|---|---|
| **DIVISION 12** | **FURNISHINGS** |
| 12355 | Residential Casework |
| 12492 | Louver Blinds |

Subcontract No. 9989B0-017

INITIAL

| | | |
|---|---|---|
| **DIVISION 13** | | **SPECIAL CONSTRUCTION** |
| 13152 | | Swimming Pool |
| **DIVISION 14** | | **CONVEYING SYSTEMS** |
| 14210 | | Electric Traction Elevators |
| 14560 | | Chutes |

| | |
|---|---|
| **DIVISION 15** | **MECHANICAL** |
| 15016 | Mechanical and Electrical General Requirements |
| 15400 | Plumbing |
| 15529 | Fire Protection System |
| 15620 | HVAC Basic Materials and Methods |
| 15630 | Motors |
| 15701 | 100% Outside Air Dehumidification Rooftop Unit |
| 15721 | Electric Heaters |
| 15729 | Split System Air Handling Unit and Air Conditioning Units (Apartment Units) |
| 15731 | Refrigerant Piping System |
| 15733 | Split System Heat Pump |
| 15755 | Fans |
| 15765 | Ductwork (Low Pressure) |
| 15768 | Fire Dampers and Smoke Dampers |
| 15770 | Diffusers, Registers and Grilles |
| 15780 | Rooftop Units (Gas Fired) |
| 15784 | Pool Dehumidification Unit |
| 15800 | Duct Insulation |
| 15824 | Controls |
| 15880 | Balancing of Air Systems (Common Area Only) |

| | |
|---|---|
| **DIVISION 16** | **ELECTRICAL** |
| 16200 | Electric, General |
| 16210 | Switches Modular Metering Equipment and Load Centers |
| 16240 | Raceways |
| 16250 | Outlet Boxes, Pull Boxes and Junction Boxes |
| 16260 | Wires and Cables |
| 16265 | Hangars and Supports |
| 16270 | Grounding |
| 16280 | Connection of Mechanical Equipment |
| 16290 | Wiring Devices and Smoke Detectors |
| 16300 | Lighting Fixtures |
| 16370 | Identification |
| 16426 | Switchboard |
| 16500 | Cable TV System/Telephone System |
| 16620 | Emergency Standby Generator |
| 16721 | Fire Alarm Systems |
| 16750 | Telephone Entry and Access Control Systems |

INITIAL

## Courtyard Marriott Drawing List
### Prepared by: Gordon and Greenberg August 15, 2002

| CIVIL | Drawing Prepared by VIKA Incorporated | Last Revision |
|---|---|---|
| Sheet | Title | |
| C1.01 | Existing Conditions and Demolition Plan | 04-10-03 |
| C2.01 | Site Plan 04-10-03 | |
| C2.02 | Site Details | 04-10-03 |
| C2.03 | Site Details and Notes | 04-10-03 |
| C3.01 | Sediment and Erosion Control Plan, Phase 1 and 2 | 04-10-03 |
| C3.02 | Utility Profiles and SMW Computations | 04-10-03 |
| C3.03 | Sediment and Erosion Control Details | 04-10-03 |
| C4.01 | Sand Filter Details and SWM Notes | 04-10-03 |
| C5.01 | Landscape Plan | Not Issued |

| Sheeting and Shoring Permitted Drawings | | |
|---|---|---|
| Cover Sheet | | 06/24/03 |
| SE – 1 | | 06/24/03 |
| SE – 2 | | 06/24/03 |
| SE – 3 | | 08/14/03 |
| SE – 4 | | 08/14/03 |
| SE – 5 | | Not Issued |
| SE – 6 | | 06/24/03 |

| Richter and Associates Drawings | | |
|---|---|---|
| Sheet 1 of 2 | | 01/09/03 |
| Sheet 2 of 2 | | 01/09/03 |

| ARCHITECTURAL | Drawings Prepared By Gordon and Greenberg | Last Revision |
|---|---|---|
| Sheet | Title | |
| A-0.00 | Cover Sheet | 11-18-02 |
| A-0.01 | Symbols Abbr. Legends, Code Analysis | 08-15-02 |
| A-0.02 | ADA Details | 08-15-02 |
| A-0.03 | ADA Details | 08-15-02 |
| A-0.04 | ADA Details | 08-15-02 |
| A-1.00 | Site Plans | 05-15-03 |
| A-1.01 | Site Details | 11-18-02 |
| A-1.02 | Site Details | 08-15-02 |
| A-2.00 | Column Dimension Plan G-2 | 05-15-03 |
| A-2.01 | Column Dimension Plan G-1 | 05-15-03 |
| A-2.02 | Column Dimension Lobby Level | 06-24-03 |
| A-2.03 | Column Dimension 2nd Floor | 06-24-03 |
| A-2.04 | Column Dimension 3rd Floor | 08-15-02 |
| A-2.05 | Column Dimension Typical Floor | 08-15-02 |
| A-3.00 | Garage Level G-2 Plan | 05-15-03 |
| A-3.01 | Garage Level G-1 Plan | 05-15-03 |
| A-3.02 | Lobby Level Plan | 06-24-03 |
| A-3.03 | 2nd Floor Level | 06-24-03 |
| A-3.04 | 3rd Floor Plan | 06-24-03 |
| A-3.05 | 4th Floor Plan | 06-24-03 |
| A-3.06 | 5th Floor Plan | 06-24-03 |
| A-3.07 | 6th Floor Plan | 06-24-03 |
| A-3.08 | 7th Floor Plan | 06-24-03 |
| A-3.09 | 8th Thru 12th Floor Plan | 06-24-03 |
| A-3.10 | 13th Floor Plan | 06-24-03 |
| A-3.11 | 14th Floor Plan | 06-24-03 |
| A-3.12 | Roof Plan | 06-24-03 |
| A-3.13 | Lobby Level Reflected Ceiling Plan | 06-24-03 |
| A-3.14 | 2nd Floor reflected Ceiling Plan | 11-18-02 |
| A-3.15 | Typical Floor Reflected Ceiling Plan | 11-18-02 |
| A-4.00 | Enlarged Lobby Plan | 06-24-03 |

Subcontract No. 9989B0-017

INITIAL

| | | |
|---|---|---|
| A-4.01 | Enlarged Lobby Dimension Plan Part A | 06-24-03 |
| A-4.02 | Enlarged Lobby Dimension Plan Part B | 06-24-03 |
| A-4.03 | Enlarged Lobby Furniture Plan | 06-24-03 |
| A-4.04 | Enlarged Lobby Finish Floor Plan | 06-24-03 |
| A-4.05 | Enlarged Lobby Kitchen Equipment Plan | 08-15-02 |
| A-4.06 | Enlarged 2nd Floor Plan | 06-24-03 |
| A-4.07 | Enlarged 2nd Floor Dimension Plan Part A | 06-24-03 |
| A-4.08 | Enlarged 2nd Floor Dimension Plan Part B | 06-24-03 |
| A-4.09 | Enlarged 2nd Floor Finish Plan | 06-24-03 |
| A-4.10 | Enlarged typical Floor Core Plan | 11-18-02 |
| A-4.11 | Enlarged Typical King Plan and Elevation | 11-18-02 |
| A-4.12 | Enlarged Extended King Plans and Elevations | 11-18-02 |
| A-4.13 | Enlarged Access. King (Tub) Plan and Elevations | 11-18-02 |
| A-4.14 | Enlarged Access. King (Shower) Plan and Elevation | 11-18-02 |
| A-4.15 | Enlarged King Suite Plan and Elevation | 11-18-02 |
| A-4.16 | Enlarged Corner King Plans and Elevations | 11-18-02 |
| A-4.17 | Enlarged Queen/Queen Plan and Elevation | 11-18-02 |
| A-4.18 | Enlarged Access. Q/Q (Tub) Plan and Elevation | 11-18-02 |
| A-4.19 | Enlarged Access. Q/Q (Shower) Plan and Elevation | 11-18-02 |
| A-5.00 | Elevation | 06-24-03 |
| A-5.01 | Elevation | 05-15-03 |
| A-5.02 | Elevation | 11-18-02 |
| A-5.03 | Enlarged Elevation | 08-15-02 |
| A-5.04 | Enlarged Elevation | 05-15-03 |
| A-5.05 | Enlarged Elevation | 05-15-03 |
| A-5.06 | Enlarged Elevation | 06-24-03 |
| A-5.07 | Enlarged Elevation | 06-24-03 |
| A-5.08 | Enlarged Elevation | 08-15-02 |
| A-5.09 | Enlarged Elevation | 08-15-02 |
| A-5.10 | Enlarged Elevation | 11-18-02 |
| A-6.00 | Full Building Section | 08-15-02 |
| A-6.01 | Full Building Section | 08-15-02 |
| A-6.02 | Full Building Section | 05-15-03 |
| A-6.03 | Wall Sections | 11-18-02 |
| A-6.04 | Wall Sections | 11-18-02 |
| A-6.05 | Wall Sections | 11-18-02 |
| A-6.06 | Wall Sections | 08-15-02 |
| A-6.07 | Wall Sections | 08-15-02 |
| A-6.08 | Wall Sections | 08-15-02 |
| A-6.09 | Wall Sections | 08-15-02 |
| A-6.10 | Wall Sections | 08-15-02 |
| A-6.11 | Wall Sections | 08-15-02 |
| A-6.12 | Wall Sections | 08-15-02 |
| A-6.13 | Sections and Details | 05-15-03 |
| A-6.14 | Sections and Details | 05-15-03 |
| A-6.15 | Sections and Details | 08-15-02 |
| A-6.16 | Sections and Details | 08-15-02 |
| A-7.00 | Wall Types | 08-15-02 |
| A-7.01 | Ceiling and Wall Penetrations Systems | 08-15-02 |
| A-7.02 | Column Details | 08-15-02 |
| A-7.03 | Column Details | 08-15-02 |
| A-7.04 | Shaft Details | 08-15-02 |
| A-7.05 | Precast and EFIS Profiles | 08-15-02 |
| A-7.06 | Door Schedule | 11-18-02 |
| A-7.06-A | Door Schedule | 11-18-02 |
| A-7.07 | Door Elevation and Details | 11-18-02 |
| A-7.08 | Finish Schedule | 11-18-02 |
| A-7.09 | Window Schedule | 08-15-02 |
| A-7.10 | Accessories, Equipment and Furniture Schedule | 08-15-02 |
| A-7.11 | Finish Index | 08-15-02 |
| A-7.12 | Finish Index | 08-15-02 |
| A-7.13 | Finish Index | 08-15-02 |
| A-7.14 | Finish Index | 08-15-02 |
| A-8.00 | Public Space Interior Elevations | 08-15-02 |

INITIAL

| A-8.01 | Public Space Interior Elevations | 11-18-02 |
| A-8.02 | Public Space Interior Elevations | 11-18-02 |
| A-8.03 | Public Space Interior Elevations | 11-18-02 |
| A-8.04 | Public Space Interior Elevations | 08-15-02 |
| A-8.05 | Public Space Interior Elevations | 11-18-02 |
| A-8.06 | Public Space Interior Elevations | 08-15-02 |
| A-8.07 | Public Space Interior Elevations | 11-18-02 |
| A-9.00 | Stair #1 Plans, Sections and Details | 08-15-02 |
| A-9.01 | Stair #2 Plans, Sections and Details | 08-15-02 |
| A-9.02 | Pool Plan, Section and Details | 11-18-02 |
| A-9.03 | Elevator 1 and 2 Plans, Sections and Details | 08-15-02 |
| A-9.04 | Garage Elevators Plans, Sections and Details | 08-15-02 |
| A-9.05 | Service Elevator Plans, Sections and Details | 08-15-02 |
| A-9.06 | Linen Chute Plans, Sections and Details | 08-15-02 |
| A-9.07 | Misc. Sections and Details | 08-15-02 |
| A-9.08 | Misc. Sections and Details | 08-15-02 |
| A-9.09 | Misc. Sections and Details | 08-15-02 |
| A-9.10 | Misc. Sections and Details | 11-18-02 |
| A-9.11 | Misc. Sections and Details | 08-15-02 |
| A-9.12 | Misc. Sections and Details | 08-15-02 |
| A-10.00 | Front Desk Sections and Details | 11-18-02 |
| A-10.01 | Millwork Sections and Details | 11-18-02 |
| A-10.02 | Millwork Sections and Details | 08-15-02 |
| A-10.03 | Millwork Sections and Details | 08-15-02 |
| A-10.04 | Millwork Sections and Details | 11-18-02 |
| A-10.05 | Millwork Sections and Details | 08-15-02 |
| A-10.06 | Millwork Sections and Details | 11-18-02 |
| A-10.07 | Millwork Sections and Details | 11-18-02 |

**KITCHEN**          **Drawing Prepared by Tricon Foodservice Consultants**

| Sheet | Title | Last Revision |
| --- | --- | --- |
| K-1.1 | Kitchen Equipment Plan | 01-28-03 |
| K-1.2 | Laundry Equipment Plan | 01-28-03 |
| K-2.1 | Kitchen Equipment Plan | 01-28-03 |
| K-2.2 | Laundry Electrical Rough-In Plan | 01-28-03 |
| K-3.1 | Kitchen Equipment Plan | 01-28-03 |
| K-3.2 | Landry Plumbing Rough-In Plan | 01-28-03 |

**STRUCTURAL**   **Drawing Prepared by Tadjer-Cohen-Edelson Associates**

| Sheet | Title | Last Revision |
| --- | --- | --- |
| S-1.01 | Foundation, G-2 Level Plan | 05-15-03 |
| S-1.02 | G-1 Garage Level Framing Plan | 05-15-03 |
| S-1.03 | Lobby Level Framing Plan | 05-15-03 |
| S-1.04 | 2nd Floor Framing Plan | 05-15-03 |
| S-1.05 | 3rd Floor Framing Plan | 08-15-02 |
| S-1.06 | 4th Floor Framing Plan | 08-15-02 |
| S-1.07 | Typical Floor Framing Plan 5th Thru 12th Floor | 08-15-02 |
| S-1.08 | 13th Floor Framing | 08-15-02 |
| S-1.09 | 14th Floor Framing Plan | 08-15-02 |
| S-1.10 | Roof Framing Plan | 08-15-02 |
| S-1.11 | Elevator, Stairs, Roof Framing Plan | 08-15-02 |
| S-2.01 | Column Schedules, Roof Details | 08-15-02 |
| S-2.02 | Beam Schedule and Details | 08-15-02 |
| S-2.03 | Concrete Beam Schedule, Misc. Details | 08-15-02 |
| S-3.01 | Sections and Details | 08-15-02 |
| S-3.02 | Sections and Details | 08-15-02 |
| S-3.03 | Sections and Details | 08-15-02 |
| S-3.04 | Sections and Details | 08-15-02 |
| S-3.05 | Sections and Details | 05-15-03 |
| S-4.01 | Typical Details | 08-15-02 |
| S-4.02 | Typical Details | 08-15-02 |
| S-4.03 | Typical Details and Structural Notes | 08-15-02 |

**MECHANICAL**   **Drawing Prepared by Mendoza, Ribas, Farinas, Associates**

Subcontract No. 9989B0-017

INITIAL 

| Sheet | Title | Last Revision |
|---|---|---|
| M-01 | Garage Level Plan G-2 HVAC | 08-15-02 |
| M-02 | Garage Level Plan G-1 HVAC | 08-15-02 |
| M-03 | Lobby Level HVAC | 09-19-02 |
| M-04 | 2nd Floor HVAC | 08-15-02 |
| M-05 | 3rd Thru 14th Floor HVAC | 08-15-02 |
| M-06 | Typical Units HVAC | 08-15-02 |
| M-07 | Roof Plan | 09-19-02 |
| M-08 | Toilet Exhaust Riser | 09-19-02 |
| M-09 | Corridor Ventilation and Stair Pressurization Risers | 08-15-02 |
| M-10 | Thru Wall Condensation Riser Diagram | 08-15-02 |
| M-11 | Schedules | 08-15-02 |
| M-12 | Schedules | 09-19-02 |
| M-13 | Details | 08-15-02 |
| M-14 | General Notes, Abbreviations and Symbols | 08-15-02 |

**PLUMBING** — **Drawing Prepared by Mendoza, Ribas, Farinas, Associates**

| Sheet | Title | Last Revision |
|---|---|---|
| P-01 | Garage Level Plan G-2 | 08-15-02 |
| P-02 | Garage Level Plan G-1 | 08-15-02 |
| P-03 | Lobby Level Plan | 08-15-02 |
| P-04 | 2nd Floor 08-15-02 | |
| P-05 | 3rd Floor 08-15-02 | |
| P-06 | 4th Thru 14th Floor, Typical | 08-15-02 |
| P-07 | Roof Plan | 08-15-02 |
| P-08 | Typical Units | 09-18-02 |
| P-09 | Partial Lobby Plan | 08-15-02 |
| P-10 | Riser Diagrams | 08-15-02 |
| P-11 | Sanitary Riser Diagrams | 09-18-02 |
| P-12 | Water riser Diagrams | 08-15-02 |
| P-13 | Fire Riser Diagram and Fire Pump Details | 08-15-02 |
| P-14 | Gas Riser and Storm Water Riser Diagrams | 10-02-03 |

**ELECTRICAL** — **Drawing Prepared by Mendoza, Ribas, Farinas, Associates**

| Sheet | Title | Last Revision |
|---|---|---|
| E-01 | Electrical Notes, Lighting Fixture Schedule, Symbols | 09-24-02 |
| E-02 | Garage Level Plan, G-2 | 10-10-02 |
| E-03 | Garage Level Plan, G-1 | 10-10-02 |
| E-04 | Lobby Floor Plan, Lighting | 10-10-02 |
| E-04A | Lobby Floor Plan, Power | 09-24-02 |
| E-04B | Electrical Connection Plan, Kitchen | 09-24-02 |
| E-05 | 2nd Floor Plan, Lighting | 10-10-02 |
| E-05A | 2nd Floor Plan, Power | 09-24-02 |
| E-05B | Electrical Connection Plan, Laundry Room Plan | 09-24-02 |
| E-06 | 3rd Floor Plan | 10-10-02 |
| E-07 | 4th Thru 14th Floor, Typical Plan | 10-10-02 |
| E-08 | Roof Plan | 10-10-02 |
| E-09 | Typical Units, ¼" Scale | 10-10-02 |
| E-09A | Typical Units Electrical | 09-24-02 |
| E-10 | Equipment Schedules | 09-24-02 |
| E-11 | Building Power Riser Diagram | 09-24-02 |
| E-12 | Building Emergency Power Riser Diagram | 12-27-02 |
| E-13 | Switchboard Schedules | 09-24-02 |
| E-14 | Electrical Panel Board Schedules | 09-24-02 |
| EE-14A | Electrical Panel Schedule | 09-24-02 |
| E-15 | Fire Alarm Riser and Notes | 12-27-02 |
| E-16 | Telephone, Data, Cable TV Riser | 10-10-02 |

**RFI Groups:**  RFI Group 1, 2, 3 dated 09/23/2002

| Addendums: | |
|---|---|
| | 1 - dated 09/06/02 |
| | 2 - dated 09/10/02 |
| | 3 - dated 09/18/02 |
| | 4 - dated 10/07/02 |

Subcontract No. 9989B0-017

INITIAL

Wage Scale: General Decision: DC20030003 10/03/2003 DC 3 (Modification #1)

LSDBE Memorandum of Understanding between Owner and the District of Columbia

First Source Employment Agreement

**SPECIFICATIONS**          Date 08/15/02

**DIVISION 0**          CONDITIONS OF THE CONTRACT
00105          INSTRUCTIONS TO BIDDERS
00220          GEOTECHNICAL DATA
00700          GENERAL CONDITIONS
00800          SUPPLEMENTARY CONDITIONS
00900          ADDENDA AND MODIFICATIONS

**DIVISION 1**          GENERAL REQUIREMENTS
01010          SUMMARY OF WORK
01022          UNIT PRICE SCHEDULE
01030          ALTERNATES
01051          PROJECT COORDINATION
01340          SHOP DRAWINGS, PROJECT DATA AND SAMPLES
01380          CONSTRUCTION PHOTOGRAPHS
01410          TESTING LABORATORY SERVICES
01500          TEMPORARY FACILITIES AND CONTROLS
01560          SITE PROCEDURES AND CONTROLS
01630          SUBSTITUTION AND PRODUCT OPTION
01700          PROJECT CLOSEOUT
01710          FINAL CLEANING
01720          PROJECT RECORD DRAWINGS
01730          OPERATING AND MAINTENANCE DATA
01750          EXTRA MATERIALS
01800          MOCK-UP ROOMS

**DIVISION 2**          SITE WORK
02050          DEMOLITION
02075          TEMPORARY EROSION AND SEDIMENT CONTROL
02100          SITE PREPARATION
02200          EARTHWORK
02240          SOIL STABILIZATION
02360          SOIL TREATMENT
02510          ASPHALTIC CONCRETE PAVING
02520          PORTLAND CEMENT CONCRETE PAVING
02580          PAVEMENT MARKING
02612          INTERLOCKING CONCRETE PAVERS
02620          SUB DRAINAGE
02810          IRRIGATION SYSTEMS

Subcontract No. 9989B0-017          Page 5 of 8          INITIAL

AP – 2.1

| 02820 | FENCES AND GATES |
| 02920 | SOIL PREPARATION |
| 02950 | TREES, PLANTS AND GROUND COVERS |

| **DIVISION 3** | **CONCRETE** |
| 03300 | CAST-IN-PLACE CONCRETE |
| 03480 | PRECAST CONCRETE LINTELS |
| 03604 | NON-SHRINK GROUTS |

| **DIVISION 4** | **MASONRY** |
| 04100 | MORTAR |
| 04200 | UNIT MASONRY ASSEMBLIES |

| **DIVISION 5** | **METALS** |
| 05120 | STRUCTURAL STEEL |
| 05500 | METAL FABRICATIONS |
| 05520 | HANDRAILS AND RAILINGS |
| 05720 | ALUMINUM HANDRAILS AND RAILING SYSTEMS |

| **DIVISION 6** | **WOOD & PLASTICS** |
| 06100 | ROUGH CARPENTRY |
| 06400 | ARCHITECTURAL WOODWORK |
| 06620 | SOLID SURFACING |

| **DIVISION 7** | **THERMAL & MOISTURE PROTECTION** |
| 07109 | MEMBRANE WATERPROOFING |
| 07210 | INSULATION |
| 07240 | EXTERIOR INSULATION & FINISH SYSTEMS |
| 07530 | ELASTOMERIC MEMBRANE ROOFING |
| 07600 | FLASHING AND SHEET METAL |
| 07800 | ROOF ACCESSORIES |
| 07840 | FIRESTOPPING |
| 07845 | CERAMIC FIBER FIREPROOFING |
| 07920 | SEALANTS AND CAULKING |

| **DIVISION 8** | **DOORS AND WINDOWS** |
| 08110 | STEEL DOORS AND FRAMES |
| 08200 | WOOD AND PLASTIC DOORS |
| 08310 | ACCESS DOORS |
| 08410 | ALUMINUM ENTRANCES AND STOREFRONTS |
| 08460 | AUTOMATIC ENTRANCE DOORS |
| 08520 | ALUMINUM WINDOWS |
| 08710 | FINISH HARDWARE |
| 08800 | GLAZING |

INITIAL

| DIVISION 9 | FINISHES |
|---|---|
| 09110 | METAL SUSPENSION SYSTEMS |
| 09250 | GYPSUM WALL BOARD |
| 09265 | GYPSUM BOARD SHAFT-WALL ASSEMBLIES |
| 09310 | TILE |
| 09380 | CUT NATURAL STONE TILE |
| 09512 | LAY-IN ACOUSTICAL TILE CEILING SYSTEM |
| 09541 | FIBER REINFORCED PLASTIC COATED PANELS |
| 09680 | CARPETING |
| 09900 | PAINTING |
| 09950 | WALL COVERING |
| 09960 | HIGH PERFORMANCE COATINGS |

| DIVISION 10 | SPECIALTIES |
|---|---|
| 10100 | VISUAL DISPLAY BOARDS |
| 10160 | TOILET PARTITIONS, PLASTIC LAMINATE |
| 10200 | LOUVERS |
| 10305 | MANUFACTURED FIREPLACES |
| 10350 | FLAGPOLES` |
| 10400 | IDENTIFICATION DEVICES |
| 10500 | METAL LOCKERS |
| 10520 | FIRE EXTINGUISHERS AND CABINETS |
| 10800 | TOILET, BATH AND LAUNDRY ACCESSORIES |
| 10900 | MISCELLANEOUS SPECIALTIES |

| DIVISION 11 | EQUIPMENT |
|---|---|
| 11080 | REGISTRATION EQUIPMENT |
| 11110 | COMMERCIAL LAUNDRY AND DRY CLEANING EQUIPMENT |
| 11400 | FOOD SERVICE EQUIPMENT |
| 11450 | RESIDENTIAL EQUIPMENT |

| DIVISION 12 | FURNISHINGS |
|---|---|
| 12505 | FURNITURE AND FIXTURE INSTALLATION |

| DIVISION 13 | SPECIAL CONSTRUCTION |
|---|---|
| 13152 | SWIMMING POOLS-INTERIOR |
| 13730 | SECURITY ACCESS |
| 13850 | FIRE ALARM AND DETECTION SYSTEM |
| 13900 | FIRE SUPPRESSION |

| DIVISION 14 | CONVEYING SYSTEMS |
|---|---|
| 14200 | TRACTION ELEVATORS |
| 14240 | HYDRAULIC ELEVATORS |
| 14560 | LINEN CHUTE |

| DIVISION 15 | MECHANICAL |
|---|---|

Subcontract No. 9989B0-017

INITIAL

| 15016 | MECHANICAL AND ELECTRICAL GENERAL REQUIREMENTS |
| 15400 | PLUMBING |
| 15529 | FIRE PROTECTION SYSTEM |
| 15620 | HVAC BASIC MATERIALS AND METHODS |
| 15630 | MOTORS |
| 15701 | 100% OUTSIDE AIR DEHUMIDIFICATION FOOFTOP UNIT |
| 15721 | ELECTRIC HEATERS |
| 15729A | THRU WALL HEAT PUMP UNITS |
| 15731 | REFRIGERANT PIPING SYSTEM |
| 15733 | SPLIT SYSTEM HEAT PUMP UNITS |
| 15755 | FANS |
| 15765 | DUCTWORK (LOW PRESSURES) |
| 15768 | FIRE/SMOKE DAMPERS |
| 15770 | DIFFUSERS, REGISTERS AND GRILLES |
| 15800 | DUCT INSULATION |
| 15824 | TEMPERATURE CONTROLS |
| 15880 | BALANCING OF AIR SYSTEMS (COMMON AREA ONLY) |
| | |
| **DIVISION 16** | **ELECTRICAL** |
| 16200 | ELECTRICAL GENERAL |
| 16240 | RACEWAYS |
| 16250 | OUTLET BOXES, FULL BOXES AND JUNCTION BOXES |
| 16260 | WIRES AND CABLES |
| 16265 | HANGERS AND SUPPORTS |
| 16270 | GROUNDING |
| 16280 | CONNECTION OF MECHANICAL EQUIPMENT |
| 16290 | WIRING DEVICES AND SMOKE DETECTORS |
| 16300 | LIGHTING FIXTURES |
| 16370 | IDENTIFICATION |
| 16380 | CONTRACTOR, TIME CLOCK AND PHOTO |
| 16425 | SWITCHES, PANELBOARDS, LOADCENTER, AND MODULAR METERING EQUIPMENT |
| 16426 | SWITCHBOARD |
| 16620 | EMERGENCY STANDBY GENERATOR |
| 16720 | FIRE ALARM SYSTEM |
| 16724 | SECURITY ALARM SYSTEM |
| 16740 | TELEPHONE SYSTEM |
| 16780 | MATV SYSTEM |

**Capitol Hill Project Drawing List    – 10/30/03 Set**
Prepared by: SKG Architects and Planners, LLC

**COVER SHEET**

A0.01          Cover Sheet

**CIVIL  Drawings prepared by Vika, Incorporated**

| DWG# | Drawing Name | Last Revision |
|---|---|---|
| C1.01 | Existing Condition and Demolition Plan | 04/10/2003 |
| C2.01 | Site Plan | 04/10/2003 |
| C2.02 | Site Details | 04/10/2003 |
| C2.03 | Site Details and Notes | 04/10/2003 |
| C3.01 | Sediment & Erosion Control Notes | 04/10/2003 |
| C3.02 | Sediment & Erosion Control Notes | 04/10/2003 |
| C3.03 | Sediment & Erosion Control Details | 04/10/2003 |
| C4.01 | Sand Filter Details & SWM Notes | 04/10/2003 |
| C5.01 | Landscape Plan | **Not issued** |

**Sheeting and Shoring Permitted Drawings**

| | |
|---|---|
| Cover Sheet | 06/24/03 |
| SE – 1 | 06/24/03 |
| SE – 2 | 06/24/03 |
| SE – 3 | 08/14/03 |
| SE – 4 | 08/14/03 |
| SE – 5 | **Not Issued** |
| SE – 6 | 06/24/03 |

**Richter and Associates Drawings**

| | |
|---|---|
| Sheet 1 of 2 | 01/09/03 |
| Sheet 2 of 2 | 01/09/03 |

**LANDSCAPING          Drawings prepared by Workshop**

| DWG# | Drawing Name | Last Revision |
|---|---|---|
| L0.0 | Landscaping Index Sheet | 08/20/2002 |
| L1.0 | Streetscape Layout, West Half | 08/20/2002 |
| L1.1 | Streetscape Layout, East Half | 08/20/2002 |
| L1.2 | Streetscape Planting Plan West Half | 08/20/2002 |
| L1.3 | Streetscape Planting Plan East Half | 08/20/2002 |
| L1.4 | Streetscape Details | 08/20/2002 |
| L1.5 | Streetscape Details | 08/20/2002 |
| L1.6 | Streetscape Details | 08/20/2002 |
| L2.0 | Courtyard Layout Plan | 08/20/2002 |
| L2.1 | Courtyard Grading Plan | 08/20/2002 |
| L2.2 | Courtyard Planting Plan | 08/20/2002 |
| L2.3 | Courtyard Paving Details | 08/20/2002 |
| L2.4 | Courtyard Paving Details | 08/20/2002 |
| L2.5 | Courtyard Arbor Details | 08/20/2002 |
| L2.6 | Courtyard Arbor Details | 08/20/2002 |
| L2.7 | Courtyard Fountain Details | 08/20/2002 |
| L2.8 | Courtyard Fountain Mechanical Details | 08/20/2002 |
| L2.9 | Courtyard Planter Wall Details | 08/20/2002 |
| L2.10 | Courtyard Planter Wall Details | 08/20/2002 |
| L2.11 | Courtyard Planting Plan | 08/20/2002 |
| L2.12 | Courtyard Planting Details | 08/20/2002 |
| L3.0 | Landscape Lighting Diagram | 08/20/2002 |
| L3.1 | Landscape Lighting Details | 08/20/2002 |

| L3.2 | Landscape Soil Placement Diagram | 08/20/2002 |
| L3.3 | Landscape Irrigation Diagram | 08/20/2002 |

**ARCHITECTURAL**    **Drawings prepared by SK&I Architectural Design Group, LLC**

| DWG# | Drawing Name | Last Revisions |
|------|-------------|----------------|
| A0.01 | Cover Sheet/ Drawing List | 10/30/2003 |
| A0.02 | General Notes/Abbr./Unit Analysis | 08/09/2002 |
| A0.03 | Code Analysis Garage G1 & G2 | 08/09/2002 |
| A0.04 | Code Analysis Lobby & Partial 2nd Floor Levels | 08/09/2002 |
| A0.05 | Code Analysis Typical (2nd-10th) & | 08/09/2002 |
|  | 11th-13th Floor Level Plans | 08/09/2002 |
| A0.06 | Code Analysis Upper Roof Plan & |  |
|  | Occupant Loads | 10/30/2003 |
| A1.01 | 1/8" Column Layout G2 Level | 10/30/2003 |
| A1.02 | 1/8" Column Layout G1 Level | 10/30/2003 |
| A1.03 | 1/8" Column Layout Lobby Level | 10/30/2003 |
| A1.03A | Partial column/slab layout plans for 2nd/3rd floor slab | 10/29/2003 |
| A1.04 | 1/8" Column Layout Typical Level | 10/30/2003 |
| A1.05 | 1/8" Column Layout 11 to 13 Level | 10/30/2003 |
| A1.06 | 1/8" Column Layout Roof Level | 10/30/2003 |
| A2.01 | 1/8" G2 Level Floor Plan | 10/30/2003 |
| A2.02 | 1/8" G1 Level Floor Plan | 10/30/2003 |
| A2.03 | 1/8" Lobby Level Floor Plan | 10/30/2003 |
| A2.03a | 1/8" Partial 2nd Level Floor Plan | 10/30/2003 |
| A2.04 | 1/8" Typical Level Floor Plan | 10/30/2003 |
| A2.05 | 1/8" 11th to 13th Level Floor Plan | 10/30/2003 |
| A2.06 | 1/8" Roof Level Floor Plan | 10/30/2003 |
| A3.01 | 1/4" Unit Floor Plans | 10/30/2003 |
| A3.02 | 1/4" Unit Floor Plans | 10/30/2003 |
| A3.03 | 1/4" Unit Floor Plans | 10/30/2003 |
| A3.04 | 1/4" Unit Floor Plans | 10/30/2003 |
| A3.05 | 1/4" Unit Types @ 11 to 13 Levels | 10/30/2003 |
| A3.06 | 1/4" Unit Types @ 11 to 13 Levels | 10/30/2003 |
| A3.07 | 1/4" Lobby Level Floor Plan | 10/30/2003 |
| A3.08 | 1/4" Lobby Level Floor Plan | 10/30/2003 |
| A3.09 | Stairs Plans and Sections | 08/09/2002 |
| A3.10 | Stair Plans, Sections and Details | 08/09/2002 |
| A3.11 | Elevator Plans & Sections | 10/30/2003 |
| A3.12 | Sections | 10/30/2003 |
| A4.01 | 1/8" Building Sections | 10/30/2003 |
| A4.02 | 1/8" Building Sections | 10/30/2003 |
| A4.03 | 1/8" Building Sections | 10/30/2003 |
| A4.04 | 1/8" Ramp Sections | 10/30/2003 |
| A5.01 | 1/8" Building Elevation | 10/30/2003 |
| A5.02 | 1/8" Building Elevation | 10/30/2003 |
| A5.03 | 1/8" Building Elevation | 10/30/2003 |
| A5.04 | 1/8" Building Elevation | 10/30/2003 |
| A5.05 | 1/8" Building Elevation | 10/30/2003 |
| A5.06 | Partial Elevation | 10/30/2003 |
| A5.07 | Partial Elevation | 10/30/2003 |
| A5.08 | Partial Elevation | 10/30/2003 |
| A6.01 | Sections & Details | 10/30/2003 |
| A6.02 | Sections & Details | 10/30/2003 |
| A6.03 | Sections & Details | 10/30/2003 |
| A6.04 | Sections & Details | 10/30/2003 |
| A6.05 | Sections & Details | 10/30/2003 |
| A6.06 | Sections & Details | 10/30/2003 |

Subcontract No. 9989B0-017

INITIAL

| | | |
|---|---|---|
| A6.07 | Sections & Details | 10/30/2003 |
| A6.08 | Shaft Details | 10/30/2003 |
| A6.09 | Sections & Details | 10/30/2003 |
| A6.10 | Sections & Details | 10/30/2003 |
| A6.11 | Sections & Details | 10/30/2003 |
| A7.01 | Wall Assemblies | 10/30/2003 |
| A7.02 | Window Schedule | 10/30/2003 |
| A7.03 | Window, Door & Storefronts Schedule | 10/30/2003 |
| A7.04 | Door Schedule & Notes | 10/30/2003 |
| A7.05 | Signage Schedule | 08/09/2002 |
| A8.01 | Bathroom Elevations | 08/09/2002 |
| A8.02 | Bathroom Elevations | 08/09/2002 |
| A8.03 | Bathroom Elevations | 08/13/2003 |
| A8.04 | Kitchen Elevations | 08/09/2002 |
| A9.01 | Reflected Ceiling Plan - Typical Floor | 08/09/2002 |
| A9.02 | Reflected Ceiling Plan - Typical Floor | 08/09/2002 |
| A9.03 | Reflected Ceiling Plan - 10th Floor | 08/09/2002 |
| A9.04 | Reflected Ceiling Plan - 11th-13th Floor | 08/09/2002 |

**STRUCTURAL Drawings prepared by Tadjer-Cohen-Edelson Associates**

| DWG# | Drawing Name | Last Revision |
|---|---|---|
| S1.01 | Foundation and G2 Level Framing Plan | 10/30/2003 |
| S1.02 | G1 Level Framing Plan | 10/30/2003 |
| S1.03 | Ground Floor Framing Plan | 10/30/2003 |
| S1.04 | Second Floor Framing Plan | 10/30/2003 |
| S1.05 | 3rd Floor Framing Plan | 10/30/2003 |
| S1.06 | 4th Floor Framing Plan | 10/30/2003 |
| S1.07 | Typical Floor Framing Plan 5th, 7th & 9th Floor | 10/30/2003 |
| S1.08 | 6th & 8th Floor Framing Plan | 10/30/2003 |
| S1.09 | 10th Floor Framing Plan | 10/30/2003 |
| S1.10 | 11th Floor Framing Plan | 10/30/2003 |
| S1.11 | 12th Floor Framing Plan | 10/30/2003 |
| S1.12 | 13th Floor Framing Plan | 10/30/2003 |
| S1.13 | Roof & Penthouse Floor Framing Plan | 10/30/2003 |
| S1.14 | Elevator M/R & M/R Roof Framing Plan | 10/30/2003 |
| S2.01 | Column Schedule | 10/30/2003 |
| S2.02 | Column Schedule | 10/30/2003 |
| S2.03 | Column Schedule | 10/30/2003 |
| S2.04 | Beam Schedule | 10/30/2003 |
| S3.01 | Sections and Details | 08/09/2002 |
| S3.02 | Sections and Details | 10/30/2003 |
| S3.03 | Sections and Details | 08/09/2002 |
| S3.04 | Sections and Detail | 08/09/2002 |
| S3.05 | Stairs | 08/09/2002 |
| S3.06 | Sections and Details | 10/30/2003 |
| S3.07 | Sections and Details | 10/30/2003 |
| S3.08 | Sections and Details | 08/09/2002 |
| S4.01 | Typical Details | 08/09/2002 |
| S4.02 | Typical Details and Structural Notes | 10/30/2003 |

**MECHANICAL          Drawings prepared by Mendosa, Ribas, Faunas & Associates**

| DWG# | Drawing Name | Last Revision |
|---|---|---|
| M-01 | Partial G2 Floor Plan | 08/09/2002 |
| M-02 | Partial G2 Floor Plan | 08/09/2002 |
| M-03 | Partial G1 Floor Plan | 08/09/2002 |
| M-04 | Partial G1 Floor Plan | 08/09/2002 |
| M-05a | Ground Floor Plan | 08/09/2002 |

INITIAL

| M-05b | Ground Floor Plan | 08/09/2002 |
| M-05c | Ground Floor Plan | 08/09/2002 |
| M-05d | Ground Floor Plan | 08/09/2002 |
| M-06a | Typical Floor Plan | 08/09/2002 |
| M-06b | Typical Floor Plan | 08/09/2002 |
| M-06c | Typical Floor Plan | 08/09/2002 |
| M-07a | 10th Floor Plan | 08/09/2002 |
| M-07b | 10th Floor Plan | 08/09/2002 |
| M-07c | 10th Floor Plan | 08/09/2002 |
| M-08a | 11-13 Floor Plan | 08/09/2002 |
| M-08b | 11-13 Floor Plan | 08/09/2002 |
| M-08c | 11-13 Floor Plan | 08/09/2002 |
| M-09 | Roof Floor Plan | 08/09/2002 |
| M-10 | Dryers Exhaust Riser Diagram HVAC | 08/09/2002 |
| M-11 | Toilet Exhaust Riser Diagram HVAC | 08/09/2002 |
| M-12 | Corridor & Stair Pressurization Riser Diagram HVAC | 08/09/2002 |
| M-13 | Details HVAC | 08/09/2002 |
| M-14 | Details HVAC | 08/09/2002 |
| M-15 | Details HVAC | 08/09/2002 |
| M-16 | Schedules HVAC | 08/09/2002 |
| M-17 | Schedules HVAC | 08/09/2002 |

| **PLUMBING** | **Drawings prepared by Mendosa, Ribas, Faunas & Associates** | |
| **DWG#** | **Drawing Name** | **Last Revision** |
| P-1 | Garage Level 2 North Floor Plan | 08/09/2002 |
| P-2 | Garage Level 2 South Floor Plan | 08/09/2002 |
| P-3 | Garage Level 1 North Floor Plan | 08/09/2002 |
| P-4 | Garage Level 1 South Floor Plan | 08/09/2002 |
| P-5 | Lobby Level Floor Plan | 10/03/2002 |
| P-6 | Second Floor Plan | 08/09/2002 |
| P-7 | Typical (3rd-10th) Floor Plan | 08/09/2002 |
| P-8 | Eleventh Floor Plan | 08/09/2002 |
| P-9 | 12th and 13th Floor Plan | 08/09/2002 |
| P-10 | Roof Plan | 08/09/2002 |
| P-11 | Typical Units Floor Plan | 08/09/2002 |
| P-12 | Typical Units Floor Plan | 08/09/2002 |
| P-13 | Fixture Schedule & Details | 10/03/2002 |
| P-14 | Sanitary Riser Diagrams | 08/09/2002 |
| P-15 | Sanitary Riser Diagrams | 08/09/2002 |
| P-16 | Storm Riser Diagrams | 08/09/2002 |
| P-17 | Fire Standpipe Riser Diagrams | 08/09/2002 |
| P-18 | Domestic Water Riser Diagrams | 10/03/2002 |
| P-19 | Sanitary Building Drain Riser Diagrams | 10/03/2002 |
| P-14 a | Gordon &Greenberg Storm Riser Diag. both bldg | **See Hotel Dwgs.** |

| **ELECTRICAL** | **Drawings prepared by Mendosa, Ribas, Faunas & Associates** | |
| **DWG#** | **Drawing Name** | **Last Revision** |
| E-01 | Symbols and Notes | 10/03/2002 |
| E-02 | Partial G-2 Floor Plan | 10/03/2002 |
| E-03 | Partial G-2 Floor Plan | 10/03/2002 |
| E-04 | Partial G-1 Floor Plan | 10/03/2002 |
| E-05 | Partial G-1 Floor Plan | 10/03/2002 |
| E-06 | Lobby Level Floor Plan Lighting | 10/03/2002 |
| E-07 | Lobby Level Floor Plan Power | 10/03/2002 |
| E-08 | 2nd thru 10th Typical Floor Plan | 10/03/2002 |
| E-09 | 11th-13th Floor Plan | 10/03/2002 |

Subcontract No. 9989B0-017

INITIAL

| E-10 | Roof Floor Plan | 10/03/2002 |
| E-11A | 1/4" Units Floor Plan | 10/03/2002 |
| E-11B | Units Floor Plan | 10/03/2002 |
| E-11C | Units Floor Plan | 10/03/2002 |
| E-12A | Units Floor Plan | 10/03/2002 |
| E-12B | Units Floor Plan | 10/03/2002 |
| E-13 | Units Power Riser Diagram | 10/03/2002 |
| E-14 | Building Power Riser Diagram | 10/03/2002 |
| E-15 | Panel Board Schedules | 10/03/2002 |
| E-15a | Panel Board Schedules | 10/03/2002 |
| E-16 | Schedules & Details | 10/03/2002 |
| E-17 | Building Single Line & Elevations | 10/03/2002 |
| E-18 | Fire Alarm Riser Diagram | 10/03/2002 |
| E-19 | Cable TV and Telephone Diagrams | 10/03/2002 |
| E-20 | Garage Plan Level G1 Fire Alarm | 04/23/2003 |
| E-21 | Garage Plan Level G2 Fire Alarm | 04/23/2003 |

**INTERIOR DESIGN    Drawings prepared by Leslie Gill Architects**

| DWG# | Drawing Name | Last Revision |
| --- | --- | --- |
| ID-01 | 1st Flr. Lobby Public Spaces Paving Plan | 08/09/2002 |
| ID-02 | 1st Flr. Lobby Public Spaces Reflected Ceiling Plan | 08/09/2002 |
| ID-03 | 1st Flr. Lobby Public Spaces Power, Telephone Data | 08/09/2002 |
| ID-04 | Elevation: Lobby, Party Room, and Mail Room | 08/09/2002 |
| ID-05 | Finish and Specialties Schedules | 08/09/2002 |
| ID-06 | 1/4" Plan: Lobby Level | 08/09/2002 |
| ID-07 | 1/4" Plan/Section/Elevation: Reception Desk/ Cabinet Niche | 08/09/2002 |
| ID-08 | 1/4" Plan Detail: Lobby Level | 08/09/2002 |
| ID-09 | 1/4" Section Detail: Lobby Level | 08/09/2002 |
| ID-10 | 1/4" Plan/Section Detail: Reception Desk/ Cabinet Niche | 08/09/2002 |
| ID-11 | 1/8" Elevator 1, 2 Plan and Details | 08/09/2002 |

| ADDENDUM #1 | DATED 09/06/02 |
| --- | --- |
| ADDENDUM # 2 | DATED 09/10/02 |
| ADDENDUM #3 | DATED 09/18/02 |
| ADDENDUM #4 | DATED 10/07/02 |

ATTACHMENTS
- RFI – Group 1, 2,3,4, - 09/24/02; 7,8 – 10/02/02; 9,10,11 – 10/10/02
- Wage Scale – General Decision: DC 20030003 dated 10/03/03 – DC 3
- LSDBE Memorandum of Understanding between Owner and the District of Columbia
- First Source Employment Agreement
- HUD –2554 (2/2002) Supplement Conditions of the Contract for Construction
- HUD-92442-A (11/00) Construction Contract Cost Plus Between Owner and Contractor

**BIDDING REQUIREMENTS, CONTRACT FORMS AND CONDITIONS OF THE CONTRACT –
DATED 08/09/02**

| | |
|---|---|
| 00002 | Project Directory |
| 00007 | Seals Page |
| 00010 | Table Of Contents |
| 00300 | Information Available To Bidders |
| 00410 | Bid Bond (AIA Document A312, 1984) |
| 00615 | Performance Bond and Payment Bond |
| 00700 | General Conditions (AIA Document A201, 1997) |
| 00800 | Supplementary Conditions |
| 00810 | U.S. Dept. of Housing and Urban Development Supplementary Conditions |
| 00820 | U.S. Dept. of Housing and Urban Development-Wage Rates |

**SPECIFICATIONS**

**DIVISION 1**       **GENERAL REQUIREMENTS**

| | |
|---|---|
| 01100 | Summary |
| 01200 | Price and Payment Procedures |
| 01230 | Alternates |
| 01270 | Unit Prices |
| 01300 | Administrative Requirements |
| 01325 | Construction Progress Schedule |
| 01400 | Quality Requirements |
| 01410 | Regulatory Requirements |
| 01420 | Abbreviations and Definitions |
| 01425 | Reference Standards |
| 01500 | Temporary Facilities and Controls |
| 01563 | Tree and Plant Protection |
| 01600 | Product Requirements |
| 01700 | Execution Requirements |
| 01780 | Closeout Submittals |
| 01810 | Commissioning |

**DIVISION 2**       **SITE CONSTRUCTION**

| | |
|---|---|
| 02050 | Demolition |
| 02230 | Site Clearing |
| 02260 | Excavation Support and Protection |
| 02310 | Grading |
| 02315 | Excavation |
| 02316 | Fill and Backfill |
| 02317 | Trenching for Site Utilities |
| 02361 | Soil Treatment for Termite Control |

INITIAL

| 02370 | Sediment and Erosion Control |
| 02468 | Drilled Concrete Piers (Caissons) |
| 02510 | Water Distribution |
| 02515 | Disinfection of Water Distribution System |
| 02535 | Sanitary Sewer Piping |
| 02551 | Site Gas Distribution |
| 02582 | Underground Electrical Ducts and Manholes |
| 02620 | Subdrainage |
| 02635 | Storm Drainage Piping |
| 02640 | Manholes and Covers |
| 02721 | Aggregate Base Course |
| 02741 | Bituminous Concrete Paving (For Roadway Repair) |
| 02751 | Portland Cement Concrete paving |
| 02751 | Concrete Paving (Added by Addendum 2) |
| 02760 | Pavement Marking |
| 02780 | Unit Pavers (Added by Addendum 2) |
| 02783 | Pavers |
| 02810 | Landscape Irrigation |
| 02813 | Landscape Irrigation (Added by Addendum 2) |
| 02822 | Ornamental Metal Fences and Gates |
| 02870 | Site and Street Furnishings |
| 02900 | Plantings and Planting Soil (Added by Addendum 2) |
| 02910 | Topsoil and Tillage |
| 02923 | Sodding |
| 02930 | On-Structure Exterior Plantings and Soils |

| **DIVISION 3** | **CONCRETE** |
| 03100 | Concrete Forms and Accessories |
| 03200 | Concrete Reinforcement |
| 03300 | Cast-In-Place Concrete |
| 03386 | Post-Tensioned Structural Concrete |
| 03450 | Precast Architectural Concrete (Added by Addendum 2) |

| **DIVISION 4** | **MASONRY** |
| 04065 | Mortar and Masonry Grout |
| 04230 | Calcium Silicate Masonry Units |
| 04720 | Architectural Cast Stone |
| 04810 | Unit Masonry Assemblies |
| 04810 | Dimensioned Granite Masonry (Added by Addendum 2) |

| **DIVISION 5** | **METALS** |
| 05120 | Structural Steel |
| 05400 | Cold-Formed Metal Framing |
| 05500 | Metal Fabrications |
| 05500 | Iron Wicket (Added by Addendum 2) |

INITIAL

| 05510 | Metal Stairs |
| 05700 | Ornamental Metal |

**DIVISION 6**     **WOOD AND PLASTICS**

| 06100 | Rough Carpentry |
| 06130 | Specialty site Timber Construction (Added by Addendum 2) |
| 06200 | Finish Carpentry |
| 06423 | Wood Veneer Faced Paneling |
| 06620 | Cast Plastic Fabrications |

**DIVISION 7**     **THERMAL AND MOISTURE PROTECTION**

| 07110 | Sheet membrane Waterproofing (Modified Bituminous) Vertical Wall Surface |
| 07111 | Fluid Applied Waterproofing (Hot Applied Rubberized Asphalt) Horizontal Slab Surfaces |
| 07115 | Bituminous Dampproofing |
| 07170 | Bentonite Waterproofing |
| 07185 | Pedestrian Traffic Membrane |
| 07212 | Board and Batt Insulation |
| 07240 | Exterior Insulation and Finish System |
| 07243 | Direct Applied Exterior Finish System |
| 07556 | Rubberized Asphalt Roofing |
| 07620 | Sheet Metal Flashing and Trim |
| 07830 | Roof Hatch |
| 07840 | Firestopping |
| 07900 | Joint Sealers |

**DIVISION 8**     **DOORS AND WINDOWS**

| 08110 | Steel Doors and Frames |
| 08211 | Wood Doors |
| 08310 | Access Doors and Panels |
| 08331 | Overhead Coiling Doors |
| 08410 | Metal-Framed Storefronts |
| 08525 | Aluminum Windows and Sliding Glass Doors |
| 08630 | Metal-Framed Skylights |
| 08710 | Door Hardware |
| 08800 | Glazing |
| 08830 | Mirrors |

**DIVISION 9**     **FINISHES**

| 09220 | Portland Cement Plaster |
| 09260 | Gypsum Board Assemblies |
| 09300 | Tile |
| 09309 | Swimming Pool Tile |
| 09450 | Stone Facing (Granite and Marble) |
| 09511 | Suspended Acoustical Ceilings |
| 09545 | Doweled Grille Wood Wall |

Subcontract No. 9989B0-017

INITIAL

| 09600 | Stone Floor and Wall Tile (Marble) |
| 09641 | Hardwood Flooring – Adhesive Applied |
| 09650 | Resilient Flooring |
| 09680 | Carpet |
| 09720 | Wall Covering |
| 09805 | Textured Ceiling Coatings (Interior of Unit) |
| 09820 | Polymerized Cementitious Coating (Underside of Balcony Coating) |
| 09900 | Paints and Coatings |
| 09960 | High-Performance Coatings |

| **DIVISION 10** | **SPECIALTIES** |
| 10170 | Plastic Toilet Specialties |
| 10441 | Signage |
| 10500 | Lockers |
| 10523 | Fire Extinguishers and Accessories |
| 10552 | Mailboxes |
| 10800 | Toilet, Bath and Laundry Accessories |
| 10900 | Wardrobe and Closet Specialties |

| **DIVISION 11** | **EQUIPMENT** |
| 11014 | Window Washing Equipment |
| 11150 | Parking Control Equipment |
| 11165 | Dock Bumpers |
| 11172 | Waste Compactors |
| 11450 | Residential Equipment |

| **DIVISION 12** | **FURNISHINGS** |
| 12355 | Residential Casework |
| 12492 | Louver Blinds |

| **DIVISION 13** | **SPECIAL CONSTRUCTION** |
| 13152 | Swimming Pool |

| **DIVISION 14** | **CONVEYING SYSTEMS** |
| 14210 | Electric Traction Elevators |
| 14560 | Chutes |

| **DIVISION 15** | **MECHANICAL** |
| 15016 | Mechanical and Electrical General Requirements |
| 15400 | Plumbing |
| 15529 | Fire Protection System |
| 15620 | HVAC Basic Materials and Methods |
| 15630 | Motors |
| 15701 | 100% Outside Air Dehumidification Rooftop Unit |
| 15721 | Electric Heaters |

Subcontract No. 9989B0-017

INITIAL

| | |
|---|---|
| 15729 | Split System Air Handling Unit and Air Conditioning Units (Apartment Units) |
| 15731 | Refrigerant Piping System |
| 15733 | Split System Heat Pump |
| 15755 | Fans |
| 15765 | Ductwork (Low Pressure) |
| 15768 | Fire Dampers and Smoke Dampers |
| 15770 | Diffusers, Registers and Grilles |
| 15780 | Rooftop Units (Gas Fired) |
| 15784 | Pool Dehumidification Unit |
| 15800 | Duct Insulation |
| 15824 | Controls |
| 15880 | Balancing of Air Systems (Common Area Only) |
| | |
| **DIVISION 16** | **ELECTRICAL** |
| 16200 | Electric, General |
| 16210 | Switches Modular Metering Equipment and Load Centers |
| 16240 | Raceways |
| 16250 | Outlet Boxes, Pull Boxes and Junction Boxes |
| 16260 | Wires and Cables |
| 16265 | Hangars and Supports |
| 16270 | Grounding |
| 16280 | Connection of Mechanical Equipment |
| 16290 | Wiring Devices and Smoke Detectors |
| 16300 | Lighting Fixtures |
| 16370 | Identification |
| 16426 | Switchboard |
| 16500 | Cable TV System/Telephone System |
| 16620 | Emergency Standby Generator |
| 16721 | Fire Alarm Systems |
| 16750 | Telephone Entry and Access Control Systems |

INITIAL

## LUMP SUM PRICES

1. Aluminum Windows, Glass & Glazing .........................................................................$1,741,657.00

Above stipulated price includes a minimum of 0% ($ 00.00) with certified LSDBE

## Alternates and Unit Pricing

Pursuant to Article IX of this Agreement, the following Alternate(s) and/or Unit Price(s) may be accepted by Tompkins Builders, Inc.'s at its sole discretion. If so exercised it will be confirmed by written change order to this Subcontract. "No Change" modifications do require a change order. The Alternate and Unit Prices noted herein are not part of the lump sum Contract Price reflected in Article IV. Inasmuch as these Alternate(s) and/or Unit Price(s) were anticipated from the inception of the project and were priced accordingly these unit prices include ALL items of cost including, but not limited to, labor, materials, equipment, tools, supervision, jobsite and home office overhead, insurance, taxes profit, bonds and escalation as necessary to prosecute the work. All alternates and unit prices which shall remain firm throughout the duration of the project, unless specifically noted herein. Applicable quantities shall be based upon either (1) agreed upon estimates, or (2) actual measured in-place work. The net change to the subcontract price, increased or decreased, shall represent net change to quantity multiplied by the applicable unit price.

## ALTERNATES

1. It is understood and agreed that the proposed changes are currently under review by the Owner based on breakdown of estimate provided by Subcontractor as requested. Subcontractor is not to proceed with any changes indicated until approved by Owner and/or Contractor as follows:
   a. Contract documents revised thru 10/30/03 (AP 2-2) ............................. Add/deduct $_N/A___
   b. Change the Kynar finish on the aluminum windows at the CHT Apartments to Baked Enamel, to match the Marriott windows .................................................... Deduct $101,718.00
   c. Delete the break metal flashing at the windows where EIFS is replaced with brick, for both buildings, except the top two levels of the Marriott Courtyard
   ....................................................................................................................... Deduct $1,844.00
   d. Change the Kynar finish on the aluminum windows at the CHT Apartments from 3 coats to 2 coats........................................................................................................ Deduct $75,000.00
   e. Add clip & trims to window head details at the CHT Apartments, thus eliminating wood blocking, drywall and paint ........................................................................... Add $12,580.00

   f. Comply with May 2004 Davis-Bacon Prevailing Wage Decision .....................Add $23,245.00
   g. Provide skylights manufactured by A. S. C., in lieu of the specified manufacturer
   ...................................................................................................................... Deduct $20,000.00

## UNIT PRICES

| ITEM | UNITS | ADD | DEDUCT |
|------|-------|-----|--------|
| 1.    Extra earth excavation and hauling for off-site disposal. | per CY | | |

INITIAL 

2.      Extra earth excavation and hauling for on-site disposal.                                    per CY

3.      Furnish and install porous backfill, (select) including off-site                            per CY
        borrow, hauling to site and compaction.

4.      Furnish and install satisfactory earth backfill, including off-site                         per CY
        borrow, hauling to site and compaction.

5.      Seeding                                                                                       per SF

6.      Sodding                                                                                       per SY

7.      Concrete curb and gutter                                                                      per LF

8.      Concrete sidewalk                                                                             per SF

9.      See unit pricing in Section 02510, Section 3.9 submit with bid

10.     Slab on grade including preparation                                                           per SF

11.     Grade beams and foundation concrete                                                           per CY

12.     Block                                                                                          per SF

13.     Brick                                                                                          per SF

14.     Hydrocarbon Contaminated Soil                                                                 per Ton

15.     Boulders Obstruction in the Fill                                                              per CY

16.     Ledge Removal-Assumed to be in open cut areas or caisson caps.

17.     Excessive Dewatering. Define as removal of water in the excavation       Time & material
        not manageable by sump pumps and sumps in five locations.                cost

18.     Costs to lower Caissons slightly.                                                             per LF

19.     Removal of sand layers at bottom of the caisson, if any, to caissons                         per CY
        to better material.

20.     Cost to provide additional concrete volume when removal of sand                              per CY
        layers at bottom of the caisson, if any, is required.

21.     Rock removal-cost per CY to remove rock in utility trench conditions.                        per CY
        Unit cost applies when rock cannot be removed by a D-6 excavator
        equipped with a ripping fork, or a comparable backhoe excavator
        equipped with rock teeth.

22.     Unit cost at garage slabs and ramps to add Calcium Nitrate, 2 gallons                        per CY
        per CY.

INITIAL

## INSURANCE COVERAGE

### 1. Contractor Furnished Insurance

A   The Contractor has implemented a Contractor-Controlled Insurance Program (CCIP) to furnish certain insurance coverage with respect to the Project. This program is described in the 'CCIP Insurance Manual' dated March 18, 2004 (herein incorporated by reference). The CCIP will be for the benefit of the Owner, Contractor and Subcontractors who have on-site employees and only with respect to work performed at the Project. This policy does not cover off-site operations of any Enrolled Party.

### 2. Subcontractor Furnished Insurance

A.   Subcontractor (and all sub tier subcontractors) shall maintain, at its own expenses, additional insurance coverage as described in the 'CCIP Insurance Manual' dated March 18, 2004, Section 5, Subcontractor-Maintained Coverages. Owner and Contractor make no warranty regarding the types or amounts of insurance necessary to protect any party against potential loss. Subcontractor is responsible to determine the amount of insurance and additional types of insurance necessary to protect its assets. Any additional insurance deemed necessary shall be purchased at the subcontractor's own expense.

B.   INSURANCE CERTIFICATES
Prior to starting any work or entering onto the jobsite, Subcontractor is required to furnish a satisfactory insurance certificate to the Contractor attesting to the existence of the insurance required above and as required by the 'CCIP Insurance Manual' dated March 18, 2004.

## SPECIAL PROVISIONS

The following additions, deletions, and modifications constitute a part of this agreement between Contractor and <u>WGG Inc.</u> dated <u>November 2, 2004.</u>

1.  <u>Article VII – Dimensions</u> – First Paragraph, delete "take such field measurements as will" and insert at the end of the paragraph "The rough opening sizes will be based on the shop drawings prepared by the Subcontractor, in accordance with the contract documents.

2.  <u>Article XII – Loss or Damage to Work</u> – Add at the end of the First Paragraph, "Cost of repairs to damaged work caused by others is subject to this Subcontractor's/ Contractor's identification of the responsible party. The reimbursement of cost associated with repair to the work will be subject to agreement and reimbursement of cost from the responsible party.

INITIAL

## SUPPLEMENTARY PROVISIONS

The following provisions constitute a part of this Subcontract:

1.  Accounting/Billings:

    A.  Billings for Work executed under this Subcontract must be received in the Contractor's field office no later than the close of business on the 20TH of the month or as determined by the project staff, showing the proportionate value of work completed through the end of the month. The value of the Work shall be based on the approved schedule of values for various portions of the Work and all authorized additions and deductions to the Contract Price. Billings received after this date will be included in the following month's requisitions to the Owner.

    B.  The following items must be submitted with each month's requisition:

        1.  A monthly affidavit listing persons and/or firms from whom the Subcontractor purchased or rented materials, supplies, equipment or services and the amount presently due each.

        2.  A release of lien waiver from the Subcontractor for the amount due them for work performed and shipments made through the cut-off date on the previous month's requisition when required at the discretion of the Contractor.

        3.  All LSDBE and First Source Agreement reporting forms as required by the requirements outlined in the Contract Documents Exhibits entitled, "First Source Agreement and LSDBE Memorandum of Understanding between Owner and the District of Columbia".

2.  Subcontractor shall comply with the LSDBE Memorandum of Understanding, First Source Agreement and the various "Action Agreements" between the Owner and the District of Columbia. The Subcontractor agrees to ensure that qualified Local, Small and Disadvantaged Business Enterprises ("LSDBEs") have the maximum opportunity to participate in the performance of contracts and subcontracts financed in whole or in part under the Contract. The Subcontractor shall not discriminate on the basis of race, color, national origin, or sex in the award and performance of subcontracts. The subcontractor agrees to make good faith efforts to include qualified LSDBEs in the Work. The provisions of the Action Agreements required by the terms thereof to be incorporated into this Subcontract are hereby incorporated herein by this reference as if set forth in full. Without limitation of the foregoing (1) Subcontractor shall enter into a First Source Employment Agreement with the District's Department of Employment Services with respect to the Work; (2) negotiate and provide an Aprenticeship Program with the D.C. Apprinticeship Council with respect to the Work, in satisfaction of Owner's obligation under Owner's First Source Employment Agreement with the Distict; (3) cause all lower tier subcontractors with subcontracts for portions of the Work totaling $100,000 or more in the aggregate to enter into a First Source Agreement with respect to the Work; (4) fulfill all of the Owner's hiring and recruitment obligations, under the First Source Agreement and Owner's LSDBE Memorandum of Understanding with respect to Subcontractr's new hires for the Work, and cause each of the lower tier subcontractors to do the same; (5) comply with the commitments that Owner is required to obtained from Subcontrcator under Section 5 of the LSDBE Memorandum of Understanding; (6) use best faith efforts to assist Owner in spending 35% of the Cost of the Work plus the Base Building Work with LSDBEs for goods, materials, and services in connecton with such Work; (7) comply with Owner's commitments under the LSDBE Memorandum of understanding with respect to the Work, including without limitation the LSDBE Participation Plan included as Attachement A to the LSDBE Memorandum of Understanding; (8) comply with all covenents of the LSDBE Memorandum of Unsertanding required to be performed by the Contractor, or other contractor, and cause all subcontractors (of any tier) to do the same; (9) comply with Owner's Employment Plan with the District with respect to Subcontractor's hiring for the Work; and (10) comply with Owner's obligations under the Equal Employment Opportunity Statement with respect to the Work. Subcontractor hereby agrees to amend or modify this Subcontract as necessary to include any provisions that are required to be included by the Action Agreeements prepared in connection with and pursuant to the terms and conditions of the Development Agreement.

3.  Progress meetings will be held weekly and attendance by the Subcontractor's site supervisor and a representative of the Subcontractor's main office with the authority to make commitments on behalf of the Subcontractor is mandatory. It is at these meetings that many items will be discussed affecting the performance and scheduling of the work. The Subcontractor shall be prepared to discuss at the meeting his upcoming work and all issues effecting his work on the

project. Failure to attend this meeting "may" result in an administrative charge per missed meeting from the Contractor for additional costs incurred to coordinate your work outside of the scheduled coordination meeting.

4.  Subcontractor shall submit daily reports to Contractor in a manner and on forms as required by the Contractor indicating the number of workman on site and the nature of the work performed along with a report of any accidents, which have occurred. No later than 3:00 pm each day.

5.  Subcontractor shall at all times keep his work area in an orderly and broom cleaned condition in accordance with Article 13. Clean-up costs for unknown sources of debris will be prorated among subcontractors working on the project at the time of the clean-up,

6.  Subcontractor shall provide for installation, maintenance, and removal of any temporary sheds, field offices, electrical power for field offices or sheds, telephone service, and drinking water required for his exclusive use. The Subcontractor shall not store any materials on-site or erect any sheds, offices, etc. without prior approval of the Contractor. Onsite material storage will be limited and staging of material and equipment offsite will be required. Any stored material, shed, office, etc., which interferes with orderly progress of the Work shall be promptly relocated or removed from the jobsite as directed by the Contractor. The Subcontractor shall be responsible for protection of any and all stored material.

7.  Subcontractor shall insure that storage of flammable or hazardous materials is in accordance with applicable safety provisions, shall not store equipment or materials in such a manner as to overload or damage the floor, structure or structural frame of the building, shall not use the site for activities related to other projects and shall stock the floors in accordance with a stocking plan and schedule approved by the Contractor.

8.  Subcontractor shall remove mud/debris from all trucks and equipment prior to vehicles exiting the site. Subcontractor will be responsible for cleaning mud and debris from adjacent roads should this Subcontractor fail to remove mud and debris to the satisfaction of the local governing authority, Contractor and the Owner or his authorized representatives. Subcontractor shall supply flag person for his work.

9.  Subcontractor understands that the Project involves performing Work adjacent to an existing building, all of which will be open for business during the term of this Agreement.  To minimize the disruption and inconvenience of the ongoing operation on the adjacent premise, Subcontractor shall strictly limit and confine its Work to the project site and shall take reasonably necessary measures to minimize any disturbance or adverse impact to the use, occupancy and enjoyment of the existing building.

10. Subcontractor shall furnish, install, maintain, and remove all hoists, shoring, bracing, cranes, safety equipment, scaffolding including all fees and permits required for the Work of this Subcontract. Subcontractor will provide all shoring, bracing and protection of existing structures for the hoisting operations. In addition, a competent person in charge of scaffolding shall be designated and present on site at all times that this equipment is in use.  Provide traffic control during deliveries.

11. Subcontractor shall provide all engineering and layout for his own work from base lines and benchmarks provided by the Contractor.  Subcontractor is responsible for taking field measurements as may be necessary to establish or verify dimensions prior to production of fabricated items. Contractor shall not be responsible to guarantee dimensions for the Subcontractor.

12. The project dumpster shall not be used for the disposal of any waste oil, fuels, or filters. These and like items must be removed from the site by the Subcontractor. Also, no fifty-five (55) gallon drums shall be placed in the project dumpster or left on the project site by this Subcontractor.

13. It is agreed that should it become necessary for the Subcontractor to perform additional work for the Contractor or another Subcontractor on this project, **THAT IS NOT AN OWNER-INITIATED CHANGE**, such work shall be performed at cost plus a percentage of markup not to exceed ten (10) percent (which markup shall include all overhead and profit).  Mark-up for Owner-initiated changes will be in accordance with the Prime Contract.

14. If the Work of this Subcontract involves excavation or disturbance of existing grades, Subcontractor is responsible for contacting and obtaining approval to dig from "MISS UTILITY". All requirements for re-marking of utility lines will be the requirement of the subcontractor until completed.

15. No vehicle or equipment will be permitted on-site without prior approval of the Contractor and after such approval, only in area(s) designated by the Contractor. No company vehicles shall be permitted within the building(s) construction area unless off-loading equipment or materials. No personal vehicle will be permitted onsite. Any vehicle left in areas of prohibited parking will be towed at the vehicle owner's expense. Parking will not be provided. Subcontractor recognizes that the site access, space and staging are limited. The subcontractor shall be responsible for any additional provisions that may be required due to these constraints including but not limited to, staged deliveries, offsite storage of materials and off- hour's deliveries.

16. Contractor's field office telephones and facsimiles are **not** for subcontractor use.

17. If any commodity furnished herein requires a Material Safety Data Sheet pursuant to the OSHA Hazard Communication Standards, copies of such material safety data sheet shall be provided within ten (10) days of Subcontract award.

18. Subcontractor agrees to purchase all contract documents required for the Work, from a source provided by the Contractor. It is the responsibility of this Subcontractor to confirm that the obtained documents conform to the documents listed in this Subcontract. Contractor will provide subcontractor with a "CD"of the Contract Documents. Subcontractor's field personnel must have the latest Contract documents, shop drawings, specifications, field drawings, etc. at all times while performing its work.

19. Contractor will provide temporary toilet facilities. A source of temporary water and power will not be available at the start of the project. Electric welding machines shall not be connected to temporary power sources. It will be the Subcontractor's responsibility to extend these services as required for the performance of his work

20. Subcontractor shall be responsible for control and evacuation of dust, fumes and smoke resulting from their work.

21. Normal work hours are those as mandated by the municipality jurisdiction.

22. Subcontractor shall provide resumes and references for any site supervisors and office personnel (Project Managers) assigned to the project. The Contractor must approve the team prior to start of any Work under this Subcontract.

23. Subcontractor will assist the Contractor implementing and maintaining an effective Quality Control Program.

24. Subcontractor to provide material delivery schedule within one month of executions of the subcontract and must coordinate all deliveries with the Contractor forty-eight (48) hours prior to delivery. Any delivery not coordinated with the Contractor may not be accepted at the Project. Provide all traffic control, flagmen, permits and fees necessary for the performance of the work.

25. Subcontractor shall comply with CCIP "Contractors Controlled Insurance Program" as defined in CCIP Manual created for this project.

26. The provisions set forth in the Contract Documents shall govern changes in the Work. When a notice of a contemplated change in the work is issued, the Subcontractor shall within seven (7) days after its receipt submit to the Contractor his proposal, completely itemized as required for the changes to the Subcontract amount or time necessitated by the change. Failure of the Subcontractor to submit a proposal within seven (7) days shall constitute the Subcontractor's acceptance to perform any additional work indicated on the revised documents for no increase in Subcontract amount or time. The seven (7) day limit may be extended only by written permission of the Contractor on an individual basis. Acceptance of a proposal from the Subcontractor after the time specified herein shall not constitute a waiver of any provision of this Article.

27. In as much as time is of the essence, any time loss as a result to adverse weather conditions shall be made up working Saturdays and/or working linger hours at no additional cost to the Contractor.

28. The Contractor or Owner shall provide the Builder's Risk Insurance. The Subcontractor shall be responsible for all deductibles on claims against the Builder's Risk Insurance as a result of the Work of this Subcontract.

29. Subcontractor shall comply with Contractors Site Specific Safety Plan and shall abide by all local governing regulations and OSHA safety requirements including, 100% Safety Glasses Program and six foot fall requirements, "Drug and Alcohol Abuse Policy and Contractor "OSHA 30- Hour Training" - Subcontractor must commit key field supervisory staff to register and complete, within three months of award, the Tompkins/OSHA 30-Hour Safety Certification training course via the Turner Knowledge Network (TKN). Supervisory staff shall remain current for the duration of their Work.   The cost for this training is $ 595.00 per person and certification is valid for three years. Subcontractor and all lower tier Subcontractors will comply with the requirements of Tompkins 30 hour OSHA Program.

30. Subcontractor shall abide by all provisions set forth in Hud-2554 (2/2002) "Supplementary Conditions of the Contract for Construction".

31. Subcontractor shall abide by Article 7- Waiver of Lien or Claim in Hud-92442-A (11/00).

32. Subcontractor shall be aware of Liquidated Damages provisions on this project. Time is of the essence in the performance of the Subcontractor's Work.  The Subcontractor and its' Supplier(s), Vendor(s), Subcontractor(s) and material man agree to be liable for any liquidated damages assessed Tompkins by the Owner, to the extent that the assessment of liquidated damages is attributable to the Work furnished pursuant to this Agreement.

33. Execution of Subcontract Agreement -- For the mutual protection of all parties to this agreement, this Subcontractor agrees to the timely execution of this agreement and any associated documents required by its terms.  It is Tompkins' intent that contract signing/execution shall take place at the time of closing (while at Tompkins' office) except in unique cases authorized by Tompkins' Vice President of Purchasing.   Under no circumstances, however, shall this Subcontractor take more than five (5) working days, after receipt of a draft/review copy of this agreement, to present a signed agreement and required insurance certificates or any other document required by the terms of this agreement. In the event that the above stated timetable is not met, Tompkins reserves the right to void this agreement in totality, without obligation, financial or otherwise, towards this Subcontractor, his/her suppliers, vendors, material men, etc. Additionally, Tompkins reserves its right to pursue, through enforcement of the provisions of this Subcontractor's bid bond (if applicable), any recourse it may deem appropriate.

34. This "AP –6 " is intended to supplement other contract documents and is not intended to invalidate any portion of the other documents unless specifically so stated in this schedule. In case of conflict between AP-6 and other contract documents with the exception of AP-1 "Scope" , the more stringent requirements applicable to the Subcontractor shall apply.

## LABOR and MATERIAL PAYMENT BOND

Bond # __RL7866__

KNOW ALL MEN BY THESE PRESENTS; that ____WGG, Inc.____ a __PA__ corporation with principal offices located at ____506 W. Main St., Palmyra, PA 17078____ as Principal (hereinafter "Principal"), and ABBA Bonding, Inc (251)962-2858 FAX: (251) 962-2899 as Surety, a ____SUB-S____ corporation with home offices located at 1334 Ridgewood Dr. Lillian, AL 36549 (hereinafter "Surety") are held and firmly bound unto TOMPKINS BUILDERS, INC., a District of Columbia corporation (hereinafter "Obligee") in the sum of __One million seven hundred forty one thousand__ Dollars($ 1741657.00 )for the payment whereof the Principal and Surety bind themselves, and their respective heirs, administrators, executors, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has by written agreement dated __11/2/04__ entered into a subcontract with Obligee for the performance of __Glass&Glazing__ (hereinafter "the Subcontract Work") for and at the __Capitol Hill Tower__ (hereinafter the "Project") located at __920 New Jersey Ave Washington, DC 20003 SE__ in accordance with Drawings and Specifications prepared by __SK&I Architects__ which subcontract is by reference made a part hereof, and is hereinafter referred to as the "Subcontract".

NOW THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Principal shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the Subcontract, then this obligation shall be void: otherwise it shall remain in full force and effect, subject, however, to the following conditions:

1)   A Claimant is defined as one having a direct contract with the Principal or with a subcontractor of the Principal for labor, material, or both, used or reasonably required for use in the performance of the Subcontract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the Subcontract.

2)   The above named Principal and Surety hereby jointly and severally agree with the Obligee that every Claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such Claimant's work or labor was done or performed, or materials were furnished by such Claimant, may sue on this bond for the use of such Claimant, prosecute the suit to final judgment for such sum or sums as may be justly due Claimant, and have execution thereon. The Obligee shall not be liable for the payment of any costs or expenses of any such suit.

3)   No suit or action shall be commenced hereunder by any Claimant:
   a) Unless Claimant, other than one having a direct contract with the Principal, shall have given written notice to any two of the following: the Principal, the Obligee, or the Surety above named, within ninety (90) days after such Claimant did or performed the last of the work or labor, or furnished the last of the materials for which said claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed. Such notice shall be served by mailing the same registered mail or certified mail, postage prepaid, in an envelope addressed to the Principal, Obligee or Surety, at any place where an office is regularly maintained for the transaction of business, or served in any manner in which legal process may be served in the state in which the aforesaid project is located, save that such service need not be made by a public officer.
   b) After the expiration of one (1) year following the date on which the Principal ceased performing Subcontract Work, it being understood, however, that if any limitation embodied in this Bond is prohibited by any law controlling the construction hereof such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.
   c) Other than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the Project, or any part thereof, is situated, or in the United States District Court for the district in which the Project, or any part thereof, is situated, and not elsewhere.

**EXHIBIT B**

FORM 647 REV. 3/98

4)    The amount of this Bond shall be reduced by and to the extent of any payment or payments made in good faith hereunder, inclusive of the payment by Surety of mechanic's liens which may be filed of record against said improvement , whether or not claim for the amount of such lien be presented under and against this Bond.

IN WITNESS WHEREOF, the Principal and Surety have hereunto caused this Bond to be duly executed and acknowledged as set forth below this  28  day of  December  ,  2004  .

(Impress Corporate Seal)

WGG, Inc.                    Principal
(Name of Subcontractor/Principal)

ATTEST:

By: _____
                         (Officer)

Title  President

(Impress Corporate Seal)

ABBA Bonding, Inc
(Name of Surety)

ATTEST:

By: _____
                    (Attorney-in-Fact)

NOTE: An original Power of Attorney bearing same date as Bond must be attached.

### ACKNOWLEDGMENT

STATE OF  ALABAMA
                                              : ss.
COUNTY OF  Baldwin
                                              :

On this  28  day of  December  ,  2004  before me appeared  Morris C. Sears  , to me known, who being by me duly sworn, did depose and say that he resided in  Lillian AL.  that he is the  President  (Officer) of the corporation described in and which executed the foregoing LABOR and MATERIAL PAYMENT BOND (hereinafter "Instrument") as Subcontractor/ Principal; that he knew the seal of said corporation; that the seal affixed to the foregoing instrument is the corporate seal of said corporation; and that the foregoing instrument was signed, sealed and delivered by him on behalf of said corporation by its authority duly given as the voluntary act and deed of said corporation.

IN WITNESS WHEREOF, the said Morris C. Sears  (Name of Officer) has subscribed and sworn to the foregoing oaths before me, and I have hereunto set my hand and affixed my official seal the day and year first above written.

(SEAL)

January 10, 2005

_____
                    Notary Public

My Commission Expires:  6-11-08

647PYBD.DOC

2



FORM 646 REV 3/98

## PERFORMANCE BOND

Bond # RL7866

KNOW ALL MEN BY THESE PRESENTS; that ___WGG, Inc.___ a __PA__ corporation with principal offices located at __506 W. Main St., Palmyra, PA 17078__ as Principal (hereinafter "Principal"), and __ABBA Bonding, Inc  (251) 962-2858  FAX: (251) 962-2899__ as Surety, a __SUB-S__ corporation with home offices located at 1334 Ridgewood Dr. Lillian, AL 36549 (hereinafter "Surety") are held and firmly bound unto TOMPKINS BUILDERS, INC., a District of Columbia corporation (hereinafter "Obligee") in the sum of __One million seven hundred forty one thousand__ __six hundred fifty seven__ Dollars($ 1741657 ,0) for the payment whereof the Principal and Surety bind themselves, and their respective heirs, administrators, executors, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has by written agreement dated __11/2/04__ entered into a subcontract with Obligee for the performance of __Glass&Glazing__ (hereinafter "the Subcontract Work"), for and at the __Capitol Hill Tower__ (hereinafter the "Project") located at __200 New Jersey Ave, Se Washington, DC 20003__ in accordance with Drawings and Specifications prepared by __SK&I Architects__ which subcontract is by reference made a part hereof, and is hereinafter referred to as the "Subcontract".

NOW THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Principal shall promptly and faithfully perform said Subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The Surety hereby waives notice of any alteration or extension of time made by Obligee.

Whenever Principal shall be and declared by Obligee to be in default under the Subcontract, Obligee having performed Obligee's obligations thereunder, the Surety may promptly remedy the default, or shall promptly:

1) Complete the Subcontract in accordance with its terms and conditions; or
2) Obtain a bid or bids for completing the Subcontract in accordance with its terms and conditions, and upon determination by Surety of the lowest responsible bidder, or if Obligee elects, upon determination by Obligee and the Surety jointly of the lowest responsible bidder, arrange for a subcontract between such bidder and Obligee, and make available as Subcontract Work progresses (even though there should be a default or a succession of defaults under the subcontract or subcontracts of completion arranged under this paragraph) sufficient funds to pay the cost of completion less the balance of the Subcontract price; but not exceeding, including other costs and damages for which the Surety may be liable hereunder, the amount set forth in the first paragraph hereof. The term "balance of the Subcontract price," as used in this paragraph, shall mean the total amount payable by Obligee to Principal under the Subcontract and any amendments thereto, less the amount properly paid by Obligee to Principal.

No right of action shall accrue on this Bond to or for the use of any person or corporation other than Obligee or the heirs, executors, administrators or successors of Obligee.

IN WITNESS WHEREOF, the Principal and Surety have hereunto caused this Bond to be duly executed and acknowledged as set forth below this __28__ day of __December__, __2004__.

(Impress Corporate Seal)

WGG, Inc. _____ Principal
(Name of Subcontractor/Principal)

ATTEST:

By: _____
(Officer)

Title __President__

(Impress Corporate Seal)

ABBA Bonding, Inc
(Name of Surety)

ATTEST:

By: _____
(Attorney-in-Fact)

ABBA BONDING COMPANY, ALABAMA CORPORATE SEAL 2003

**EXHIBIT C**

FORM 646 REV 3/98

NOTE: An original Power of Attorney bearing same date as Bond must be attached.

ACKNOWLEDGMENT

STATE OF _Alabama_ :

COUNTY OF _Baldwin_ : ss.

     On this _28_ day of _December_ ,_2004_ before me appeared ___Morris C. Sears___ , to me known, who being by me duly sworn, did depose and say that he resided in ___Lillian, AL___ that he is the ___President___ (Officer) of the corporation described in and which executed the foregoing LABOR and MATERIAL PAYMENT BOND (hereinafter "Instrument") as Subcontractor/ Principal; that he knew the seal of said corporation; that the seal affixed to the foregoing instrument is the corporate seal of said corporation; and that the foregoing instrument was signed, sealed and delivered by him on behalf of said corporation by its authority duly given as the voluntary act and deed of said corporation.

     IN WITNESS WHEREOF, the said ___Morris C. Sears___ (Name of Officer) has subscribed and sworn to the foregoing oaths before me, and I have hereunto set my hand and affixed my official seal the day and year first above written.

(SEAL)

_January 10, 2005_

_Rhonda Leann Hamm_
Notary Public

My Commission Expires: _6-11-08_



## TOMPKINS
### B U I L D E R S

September 29, 2006

<u>VIA FACSIMILE &</u>
<u>CERTIFIED MAIL - RETURN RECEIPT</u>
<u>REQUESTED</u>
Mr. Morris C. Sears
ABBA Bonding Inc.
1334 Ridgewood Dr.
Lillian, AL  36549

*Re: CLAIM - Performance Bond No. RL7866*

Dear Mr. Morris:

ABBA Bonding Inc. ("ABBA"), as surety, provided a performance bond ("Performance Bond"), dated December 28, 2004, for the Capitol Hill Tower project ("Project"), on behalf of WGG, Inc. ("WGG"), as principal, and in favor of Tompkins Builders, Inc. ("Tompkins").

As referenced in the Performance Bond, Tompkins entered into a subcontract, dated November 2, 2004, with WGG for WGG to, among other things, furnish, labor, materials and equipment for the glass and glazing on the Project ("Subcontract").    The Performance Bond incorporates the terms of the Subcontract by reference.

As Tompkins notified you in previous correspondence, WGG is in default of its obligations under the Subcontract for, among other reasons, failure to prosecute the work with promptness and diligence; failure to perform in accordance with the construction schedule; failure to provide sufficient manpower to complete its work; failure to pay for labor, materials, equipment, supplies and services used in the performance of its work; and failure to perform its work in accordance with the contract documents.  Among other impacts, these acts and omissions have delayed, interfered with, and caused damage to the work of Tompkins and its other subcontractors.  As a result of WGG's defaults, Tompkins has also incurred, and continues to incur, damages, costs and expenses for extended general conditions, increased utility costs, liquidated damages, legal fees and repair/replacement of WGG's deficient work.

Article III of the Subcontract provides as follows:

> Should the progress of the Work or of the Project be delayed, disrupted, hindered, obstructed, or interfered with by any fault or neglect or act or failure to act of the Subcontractor or any of its officers, agents, servants, employees, subcontractors or suppliers so as to cause any additional cost, expense, liability or damage to Contractor including legal fees and disbursements incurred by Contractor (whether incurred in defending claims arising from such delay or in seeking reimbursement and indemnity from the Subcontractor and its surety hereunder or otherwise) or to the Owner or any damages or additional costs or expenses for which Contractor or the Owner may or shall become liable, the Subcontractor

Tompkins Builders, Inc.
1333 H Street, N.W.
Washington DC  20005

**EXHIBIT D**

# TOMPKINS

### B U I L D E R S

and its surety shall and does hereby agree to compensate Contractor and the Owner for and indemnify them against all such costs, expenses, damages and liability.

By this letter, Tompkins gives notice of its claim on the Performance Bond for the costs, expenses, and damages incurred to date arising out of WGG's defaults under the Subcontract.

By this letter, Tompkins gives further notice that ABBA Bonding Inc. is in breach of its obligations under the Performance Bond for failure to promptly remedy WGG's defaults, and failure to promptly provide all labor and materials required to complete the Project in accordance with the contract documents, as ABBA committed to do more than 5 months ago in its letter dated April 18, 2006. Contrary to ABBA's commitment, WGG's work remains incomplete, and many of the same items identified as incomplete or deficient 5 months ago remain incomplete or deficient today. These additional separate defaults by ABBA have aggravated the impact of WGG's defaults and compounded the costs, damages and expenses incurred and being incurred by Tompkins.

In light of the foregoing, Tompkins has issued the attached September 29, 2006, Notice of Default/72-Hour Cure Notice to WGG. Tompkins expects that in the absence of a mobilization by WGG or ABBA, on or before Wednesday, October 4, 2006, to commence fulfillment of the requirements stated in the Notice, Tompkins will terminate WGG's right to proceed under its Subcontract and proceed to complete incomplete and deficient work at your and WGG's expense.

Tompkins expressly reserves the right to amend and or modify this claim as additional costs and expenses or additional amounts unpaid by WGG become known. Tompkins also reserves all other rights, remedies, and defenses available to it and its sureties, whether at law, equity or otherwise.

Sincerely,
Tompkins Builders, Inc.

Derek K. Brown
Sr. Project Manager

cc:   Shahab Kamrad, John Madden - Tompkins
      Robert Carlson - WGG, Inc. (via facsimile and Certified Mail - Return Receipt Requested)

H 07-45 EGS

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Tompkins Builders, Inc.    110 cl    DC | ABBA Bonding, Inc. and WGG, Inc |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Douglas L. Patin
Bradley Arant Rose & White LLP
1133 Connecticut Ave., N.W., 12th Floor
Washington, D.C. 20036

ATTORNEYS (IF KNOWN)

CASE NUMBER   1:07CV00045

JUDGE: Emmet G. Sullivan

DECK TYPE: Contract

DATE STAMP: 01/09/2007

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ◉ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP** FOR PLAINTIFF AND C...

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ◉ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ◉ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

②

| ○ G. *Habeas Corpus/* *2255* | ○ H. *Employment* *Discrimination* | ○ I. *FOIA/PRIVACY* *ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA* *(non-employment)* | ○ L. *Other Civil Rights* *(non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☒ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

28 USC 1332

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complaint
JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  1-9-07    SIGNATURE OF ATTORNEY OF RECORD  _____

INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.